## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW MEXICO

In re:   RAILYARD COMPANY, LLC
         a New Mexico Limited Liability Company

              Debtor                                Case No. 15-12386-j11

### <u>MEMORANDUM OPINION ON MOTION TO APPOINT TRUSTEE</u>

THIS MATTER is before the Court on the Motion to Appoint Chapter 11 Trustee, or in the Alternative to Require Debtor to Employ a Property Manager (Docket No. 24) (the "Motion") filed by Thorofare Asset Based Lending Fund III, L.P. ("Thorofare"). Santa Fe Railyard Community Corporation ("SFRCC") filed a Statement of No Objection to the Motion (Docket No. 52) and Recreational Equipment, Inc. ("REI") filed a Joinder in the Motion (Docket No. 54). Debtor filed an Objection to the Motion (Docket No. 51). The Court held a final hearing on the Motion on February 17, 18, 19, and 26, 2016 and March 8, 2016, and took the matter under advisement. Thorofare was represented by Sutin, Thayer & Browne P.C. (Benjamin E. Thomas, Katharine C. Downey, and Jacqueline Ortiz). Debtor was represented by William F. Davis & Associates, P.C. (William F. Davis and Christopher Dvorak). REI was represented by Rodey, Dickason, Sloan, Akin & Robb, P.A. (Charles R. Hughson and Henry M. Bohnhoff).

After considering the evidence, the arguments of counsel and applicable law, the Court finds and concludes that cause exists to appoint a Chapter 11 trustee under 11 U.S.C. § 1104(a)(1). Accordingly, the Court must grant the Motion insofar as it requests appointment of a trustee and order that a trustee be appointed.

### <u>FINDINGS OF FACT</u>

In accordance with Fed.R.Civ.P 52(a)(1), made applicable by Fed.R.Bankr.P. 9014, the Court finds the following facts by clear and convincing evidence.

<u>Background</u>

A group of local businessmen in Santa Fe, New Mexico formed Debtor in 2004 for the purpose of bidding to obtain the development rights for a portion of a master planned public/private development located at an abandoned rail station near downtown Santa Fe, New Mexico, and to develop the project if the bid was successful. Debtor's founding members were Richard Jaramillo, Steve Duran, David Duran, Allen Branch, and Marco Gonzalez. The members' planed for Mr. Jaramillo to manage the property and perform maintenance on the property through his company T.R. Power Maintenance; Steve Duran to perform construction work as needed through his company, Southwest Structural Services; and David Duran to perform electrical work as needed through his company, Builders Electric Inc.

On September 1, 2005, Debtor entered into a ground sublease with SFRCC, which granted Debtor the rights to develop multiple parcels of the railyard project. On October 1, 2007, Debtor and SFRCC entered into an Amended and Restated Ground Lease (the "Ground Lease"). *See* REI's Exhibit 1. SFRCC leased the ground from the City of Santa Fe (the "City") and subleased it to Debtor. Pursuant to the Ground Lease, Debtor obtained development rights for the Market Station building, which is a two-story superstructure on top of a three-story subterranean parking garage. As this was a public/private venture, the City would continue to own the land and the subterranean parking structure, while Debtor obtained a long term ground sublease and the rights to build and own the two-story Market Station building. The City began development of the subterranean parking garage sometime in 2006. Debtor's construction of the Market Station building superstructure began the following year. As planned, Mr. Jaramillo acted as the property manager for the Market Station building from the time Debtor was awarded the project to the

- 2 -

present, which included being the primary contact between Debtor and other parties, including potential tenants, current tenants, creditors, and service providers.

<u>The Sublease</u>

On January 12, 2007, Debtor entered into a Retail Sublease with REI (the Retail Sublease, as amended from time to time by the parties, is hereafter referred to as the "Sublease"). *See* REI's Exhibit 2. Under the Sublease, REI would occupy an approximate 28,300 square foot anchor tenant location on the ground floor of the Market Station building. The Sublease provided for a base rent of $622,600.00 per year. REI is Market Station's anchor tenant.

The Sublease provided for additional rent in the form of REI's share of common area maintenance expenses ("CAM") and real property taxes ("RPT"). *See* REI's Exhibit 2, pp. 13 – 17. The purpose of this additional rent was for REI to compensate Debtor for a portion of expenses actually incurred for upkeep and other routine expenses of beautification and maintenance of the common areas, property insurance, and real property taxes. As such, Debtor and REI anticipated that the actual amount of CAM and RPT that REI should pay would vary from year to year. Initially, REI's share of CAM and RPT was estimated at 21.6% of the entire CAM and RPT expenses for the Market Station building and surrounding common areas. This estimate was based on REI's leased area divided by the total leasable square footage of the Market Station building. *See* REI's Exhibit 2, p. 8. Prior to execution of the Sublease, no real property taxes had been assessed against the property because the improvements were newly constructed and the City is exempt from property taxes. Nor was there a prior history of actual CAM expenses. In the Sublease, Debtor estimated annual CAM and RPT in the amounts of $106,125.00 and $72,165.00, respectively. *See* REI's Exhibit 2, p. 8.

- 3 -

Section 5 of the Sublease addresses the obligations of both parties relating to CAM and RPT charges. *See* REI's Exhibit 2, pp. 13 – 17. Under Section 5.1, Debtor must, within 60 days of the close of each lease year (defined to end each December 31), provide REI with (1) a notice of Debtor's reasonable estimate of REI's share of CAM and RPT for the current lease year; and (2) an annual reconciliation (i.e., an accounting in reasonable detail, together with supporting documentation, of all CAM and RPT charges for the prior lease year compared to the estimate). Until Debtor provides REI notice of the estimated CAM and RPT for a particular year, the Sublease provides that REI is to pay CAM and RPT each month based on the previous lease year's CAM and RPT estimate. Debtor may also charge an administrative fee not to exceed 10% of CAM charges, excluding RPT, other taxes, utilities, and CAM charges under the Ground Lease. REI's share of CAM, excluding insurance and utilities, for any particular lease year cannot exceed 105% of REI's share of CAM for the previous lease year. All estimates Debtor provides must be reasonable and, upon REI's request, Debtor must provide REI with evidence of the reasonable basis for the estimate. REI is then obligated to pay the estimated amount on a monthly basis through the duration of the lease year. Within 30 days of Debtor providing REI a reconciliation for the previous lease year, either Debtor must refund REI amounts REI overpaid for the previous year's CAM and RPT, or REI must pay the difference between the amount paid and its actual CAM and RPT charges for the previous year.[1]

---

[1] Section 5.1 of the Sublease further provides that if REI underpaid Debtor for CAM charges for more than one consecutive lease year based on the most recent CAM estimate Debtor provided REI, then REI would be required to pay Debtor the difference only for the immediately preceding lease year. Section 5.1 gives the following example to illustrate how this works:

> For example, Tenant receives a CAM estimate for 2008 and pays monthly amounts accordingly, Landlord then fails to timely provide an updated CAM estimate for 2009 and 2010. Tenant continues to pay monthly amounts based upon the 2008 CAM estimate throughout 2009 and 2010. Landlord later provides an updated CAM estimate in 2011. Under such example and based upon the preceding language contained in this Section 5.1, Tenant shall pay the "catch-up" amounts for the immediately preceding Lease Year (2010) only, and Landlord is precluded from collecting any "catch-up" amounts for Lease Year 2009.

Section 7 of the Sublease provides REI with the right to examine Debtor's books and records relating to the Sublease upon seven days' written notice to verify the accuracy of Debtor's calculations of base rent and REI's share of CAM and RPT. *See* REI's Exhibit 2, p. 17. Section 7 provides two penalty provisions. First, if an audit reveals that REI overpaid its share of CAM and RPT by more than 5%, or Debtor's books and records are inadequate to provide an accurate accounting of CAM and RPT, Debtor must pay for the audit and refund all overpayments to REI. Second, if the audit reveals "willful inaccuracies," Debtor must pay REI an amount equal to eight months of REI's share of CAM and RPT charges.

Section 9.8(a) of the Sublease provides the opening co-tenancy requirement and states that REI is not obligated to open for business unless at least 50% the Market Station building is occupied and open for business. *See* REI's Exhibit 2, pp. 21 – 22. Section 9.8(b) of the Sublease provides an ongoing co-tenancy requirement under which REI's base rent is reduced and/or REI may terminate the Sublease if Debtor does not meet specified occupancy targets for the Market Station building in specified circumstances. *See* REI's Exhibit 2, p. 22.

<u>Debtor's Relationship with REI</u>

Contention between Debtor and REI began early in their relationship. REI held a grand opening on September 12, 2008. By early December 2008, Debtor and REI were already embroiled in a contentious dispute regarding the delivery date of the leased premises, the date of commencement of the Sublease term, and the co-tenancy requirements. On December 2, 2008, Mr. Jaramillo sent a strongly worded email to an REI employee regarding the disputes threatening to apply legal and political pressure on REI and to air the matter in the press. *See* REI's Exhibit 19.[2] This tone would become a hallmark of several of Mr. Jaramillo's communications with REI.

---

REI's Exhibit 2, pp. 13 – 14.
[2] Specifically, Mr. Jaramillo wrote:

By late December 2008, REI and Debtor entered into a Standstill Agreement on these issues. Approximately three months later, Debtor and REI entered into a Settlement Agreement resolving the disputes. *See* REI's Exhibit 30. In August 2009, REI and Debtor entered into a First Amendment to Retail Sublease (the "First Amendment"), which, among other amendments, lowered the ongoing co-tenancy requirement from 70% to 45%. *See* REI's Exhibit 2, pp. 68 – 80.

The initial rockiness of the relationship between Debtor and REI smoothed to some extent through 2009 and 2010. However, what transpired during this time eventually contributed to a breakdown of the relationship between Debtor and REI for years to come. As described more fully below, Debtor did not provide REI with a single "annual" reconciliation for CAM and RPT charges until mid-2012, while continuing to collect CAM and RPT payments based on Debtor's original CAM and RPT estimate when the Sublease was executed in 2007. As a result, REI paid CAM and RPT greatly in excess of its share of the actual expenses. And although no taxes were assessed against the Market Station building until 2013, Debtor continued to collect RPT payments from REI during 2009, 2010 and 2011 without informing REI that no real property taxes had been assessed. Debtor collected RPT during this period because tax assessments would be applied retroactively.

In 2011, further problems began to surface. In early 2011, REI sent a letter to Debtor asserting that Debtor was in violation of the co-tenancy requirements under the Sublease, resulting in reduced base rent since July 1, 2010. *See* Debtor's Exhibit K. REI's letter invited Debtor to discuss the matter if it disagreed. Mr. Jaramillo responded two days later with an angry letter

---

We are prepared to approach this situation on many fronts including legal, political, and public relations (a press release and press conference for tomorrow at Market Station).

We will not take this matter on the chin as you suggested to me. We will dig in and fight for our rights in every manner possible. We would much rather see REI prosper in our great City, however, the clock is running and time is short – the ball is in your court.

REI's Exhibit 19.

- 6 -

characterizing REI's letter as "an aggressive attack by our corporate anchor tenant REI on our local company . . . border[ing] on contractual interference with business relations" because Debtor was then negotiating issues with the City and its lender. *See* Debtor's Exhibit T. REI withdrew its claim of breach of the co-tenancy requirement based on additional information Debtor provided.

Later that year, issues relating to the fire alarm system surfaced. In July 2011, REI conducted a series of tests of its fire alarm system, to which the Santa Fe Fire Department did not respond. REI informed Mr. Jaramillo of this concern at that time. In August 2011, the Santa Fe Fire Department inspected the fire alarm system and determined it was disconnected from the central station. The Santa Fe Fire Department gave a 10 day notice to fix the problem, which Debtor did. Additionally, around this time, REI became irritated by frequent and disruptive fire alarms. The problem of frequent fire alarms has lessened but, as of the date of trial, the problem remains and neither the Debtor nor REI seem to know what is causing the frequent alarms. It is unclear from the evidence whether the problem triggering the fire alarms originates in the underground parking garage, which the City owns and maintains, or in the Debtor's two story superstructure.

Mr. Jaramillo's apparent temper got the better of him again in December 2011 when an REI employee attempted to send an email to him complaining about the accumulation of salt on the sidewalks outside of its store. The REI employee incorrectly addressed the email (to rickjaramillo@yahoo.com instead of rickxaramillo@yahoo.com) and it was received by someone other than Mr. Jaramillo who responded to REI. When Mr. Jaramillo was notified of the email and the response, he became irate, asserted that it was "an apparent set up by somebody at REI to cause problems for us," and stated that he would likely call the police. *See* REI's Exhibit 43, p. 2.

- 7 -

The tension began to reach a boiling point after REI asked in April 2012 to audit Debtor's books and records. At that time, REI had not received a CAM and RPT reconciliation for 2008, 2009, 2010, 2011 or 2012. Pursuant to the audit provisions of Section 7.1 of the Sublease, REI requested CAM and RPT reconciliations for 2009, 2010 and 2011 together with property tax bills and insurance bills, and requested that Debtor make available all statements, books, records and contracts relating to the Sublease and the operating expenses. *See* REI's Exhibit 41. The letter stated that REI's retention of an auditor was a normal business decision, and that REI would "work cordially with your team." By mid-2012, Debtor provided REI with CAM and RPT reconciliations for 2010 and 2011 but not for 2009. However, despite several requests, Debtor provided only a few documents to REI's auditor to support the CAM charges from 2009 to 2011. As a result, REI's auditor eventually discontinued its effort without issuing an audit report.

REI notified Debtor in July 2012 that REI determined from its audit that it had overpaid Debtor $161,828.55 for RPT because no property taxes had yet been assessed against Market Station, and that it would offset this overpayment against future rent per the Sublease. *See* REI's Exhibit 42. In the midst of the dispute relating to CAM and RPT charges, on October 24, 2012, Debtor declared REI in default under the Sublease for delivering a fraudulent lien waiver and retaining an unlicensed contractor to perform tenant improvements, and demanded the return of tenant improvement funds Debtor paid REI. REI disputed both claims. By a letter dated November 11, 2012, Debtor gave REI 30 days to cure the default. *See* Debtor's Exhibit U.

On November 30, 2012, REI's attorney sent a letter to Debtor declaring Debtor in default under the Sublease, and demanding reimbursement of $216,292.56, representing (according to REI) all CAM payments REI made for 2008 and 2009 based on Debtor's failure to provide CAM reconciliations for those years despite prior demand. *See* REI's Exhibit 8. REI also stated that it

- 8 -

would begin offsetting CAM overcharges for 2010 and 2011 because Debtor had not reimbursed REI for the overcharges per a prior demand letter.

On January 30, 2013, in-house counsel for REI sent Debtor a letter stating that it was going to pay all unsubstantiated CAM charges into REI's attorneys trust account, and all future CAM and RPT charges into the trust account until Debtor's estimated charges are substantiated. In the letter counsel also expressed dismay about the degree to which REI had overpaid CAM charges based on Debtor's estimates and suggested Debtor was inappropriately using the overpayments to funds its operations. Through January 19, 2016, REI has deposited a total of $295,066.61 in its attorneys' trust account per REI's accounting provided to Debtor, consisting of three initial deposits totaling $158,242.74 and monthly deposits of $4,413.67 beginning in July 2013.

On February 11, 2013, Allen Branch, a founding member of Debtor, who was involved in litigation related to Debtor's purchase of his interest in Debtor, sent a letter to REI "as Principal Member" of Debtor. *See* REI's Exhibit 13. In the letter he purported to provide a CAM and RPT reconciliation for 2012 and an estimate for 2013 but did not attach any invoices or other documentation. He also asserted that REI for years had failed to pay any base rent to Debtor. REI responded in a letter dated February 28, 2013. *See* REI's Exhibit 10. REI also pointed out the gross disparity between the 2010 and 2011 CAM numbers reported by Mr. Branch and the CAM numbers Debtor previously reported to REI for those years. REI pointed out that no documentation accompanied the 2012 lease year reconciliation as required. REI further explained it was paying base rent into a lock box as directed.

In May 2013, Debtor provided CAM and RPT reconciliations to REI for 2009. The CAM and RPT reconciliation Debtor provided for 2009, and the 2010 and 2011 reconciliations it had provided earlier, showed that REI had paid Debtor $534,888.00 for CAM and RPT during those

- 9 -

years and that its actual share of such CAM and RPT was $222,905.79, resulting in an overpayment of $311,982.21 – meaning that REI had paid about 240% of its share of the actual expenses for 2009-2011 according to Debtor's figures. In May 2013, Mr. Jaramillo sent packages to REI containing some backup documentation for 2009-2011 CAM charges. Mr. Jaramillo followed up with an email acknowledging $311,982.21 for CAM and RPT overpayments by REI in those years, and asserting that the offsets REI already had taken against rent had exceeded the amount of the overpayments. *See* REI Exhibit 14.

The following chart summarizes Debtor's later statement of the amount of CAM and RPT overpayments for 2009-2012: [3]

|  | 2009 | 2010 | 2011 | 2012 | Totals |
|---|---|---|---|---|---|
| CAM & RPT Paid | $178,296.00 | $178,296.00 | $178,296.00 | $148,580.00 | $683,468.00 |
| Actual CAM & RPT | $70,168.19 | $76,317.91 | $76,419.69 | $95,768.55 | $318,674.34 |
| Overpayment | $108,127.81 | $101,978.09 | $101,876.31 | $52,811.45 | $364,793.66 |

The overpayments reflected in the chart were more than a mere honest mistake by Debtor. Debtor knew or should have known of the gross discrepancy between the amounts REI paid Debtor and the REI's actual share of CAM and RPT at least by sometime in 2010. Instead of annually issuing reasonable estimates of CAM and RPT charges and informing REI of Debtor's initial overestimate made in 2007, Debtor simply kept accepting overpayments from REI until REI made demand and began recouping the overpayments by offsetting rent.

Notwithstanding the fact that REI was paying CAM and RPT charges into its attorneys' trust account, Debtor did not provide CAM and RPT reconciliations to REI for 2013 and 2014 until on or about December 8, 2015, over 21 months late for 2013 and 9 months late for 2014. The

---

[3] REI asserts the amount of overpayments may be higher, and also asserts there were overpayments in 2008.

- 10 -

documentation supporting Debtor's 2013 and 2014 CAM and RPT reconciliations was incomplete: it included approximately 50% of the supporting documentation for 2013 and approximately 80% for 2014.

The industry standard for a project such as Market Station is for a landlord to provide all or substantially all supporting documentation for CAM and RPT charges to a tenant who requests the documents under a lease provision entitling the tenant to the documents. In addition, CAM reconciliations should be provided timely. As of the date of the hearing on the Motion to Appoint a Trustee, Debtor had provided reconciliations and supporting documentation to REI for CAM and RPT charges, as follows:

| Year | Date Reconciliation Due | Date Reconciliation Provided | Percentage of CAM Charges Documented to Date |
|------|-------------------------|------------------------------|----------------------------------------------|
| 2008 | March 1, 2009 | Not Provided | 0% |
| 2009 | March 1, 2010 | May 22, 2013 | 28.2% |
| 2010 | March 1, 2011 | Mid-2012 | 75.4% |
| 2011 | February 29, 2012 | Mid-2012 | 68.9% |
| 2012 | March 1, 2013 | Not Provided[4] | 0% |
| 2013 | March 1, 2014 | On or about December 8, 2015 | 50.3% |
| 2014 | March 1, 2015 | On or about December 8, 2015 | 81.2% |
| 2015 | February 29, 2016 | March 1, 2016 | Unknown |

Debtor's laptop computer crashed in August 2015, corrupting the hard drive on which Debtor kept its business records. Debtor did not backup the information. Debtor has been unable to find hard copies of its records. Debtor's loss of its business records explains neither its consistent delinquency in providing CAM and RPT reconciliations to REI, nor its failure to provide REI with adequate supporting documentation before it lost the records. In an attempt to recover

_____

[4] The February 11, 2013 letter from Allen Branch to REI purports to provide a 2012 CAM and RPT reconciliation. The Court finds that the letter is not a reconciliation because Mr. Branch's authority to act on behalf of Debtor at that time is seriously questionable; the letter was sent without the knowledge or consent of the other members of Debtor; expenses were not detailed and no supporting documentation was provided. *See* REI Exhibit 13.

the information on the hard drive, Debtor enlisted the services of the Best Buy Geek Squad, whose efforts were unsuccessful. Debtor then inquired about data recovery services to perform a more sophisticated recovery effort at a cost of approximately $1,600.00. Thorofare refused to consent to use of cash collateral to fund the cost. Debtor chose not to seek court approval of the expenditure, and Debtor's principals refused to provide the funds. Debtor's efforts to recover the data were inadequate.

Other actions by Debtor and Mr. Jaramillo have contributed to the rocky relationship between the Debtor and REI. For example, on June 15, 2015, Mr. Jaramillo left a voicemail message for REI's CEO hoping to convince REI to resolve the disputes between REI and Debtor relating to CAM and RPT charges. *See* Thorofare's Exhibit 55, p. 000733. In the voice message, Mr. Jaramillo threatened to "post a big sign saying 'Notice of Default'" on REI's store, which he suggested would result in newspaper coverage and "picket signs that say 'Please REI Corporate Monster, please pay your fair share of water – please pay your fair share of rent - please pay your fair share of property taxes and insurance.'" At trial, Debtor entered into evidence letters of intent with Trek Retail Corporation (which, like REI, sells bicycles) and Harvest Foundation (a medical marijuana dispensary), each of which arguably violate the Sublease. *See* Debtor's Exhibits H and I. Debtor did not seek input from REI before entering into these letters of intent. Debtor lacks competence to mend the broken business relationship between it and REI.

The CAM and RPT dispute still lingers, as well as the dispute regarding whether an REI retained contractor constructed tenant improvements without the required license. REI is continuing to deposit estimated CAM and RPT amounts in its attorneys' trust account.

- 12 -

Debtor has also had a tumultuous relationship with its lender, Thorofare. On April 29, 2008, Debtor obtained a loan in the amount of $14,000,000.00 from Market Station Railway Properties, LLC ("MSRP"), a subsidiary of Ambit Funding, LLC. Debtor executed a Promissory Note to evidence the loan (the "Promissory Note"). To collateralize the loan, among other things, Debtor executed an Assignment of Leases, Rents and Profits and a Leasehold Mortgage and Security Agreement (the "Mortgage"). Debtor's principals personally guaranteed the loan. By late 2014, Debtor had defaulted on the Promissory Note and was operating under a forbearance agreement with MSRP while it searched for alternate financing. In December 2014, Thorofare refinanced the Debtor's Market Station project. It purchased MSRP's interest in the Promissory Note and obtained an assignment of the related documents, including the Mortgage and Assignment of Leases, Rents and Profits. In connection with the refinance, on December 12, 2014 Debtor executed an Amended and Restated Promissory Note in the original principal amount of $9,670,000.00 (the "Amended Promissory Note") specifying new repayment terms and finance charges, an Amended and Restated Loan Agreement (the "Amended Loan Agreement"), a Cash Management Agreement (the "Cash Management Agreement"), a Holdback and Disbursement Agreement (the "Holdback Agreement"), and other documents (collectively the "Loan Documents"). *See* Thorofare's Exhibits 14-20. Debtor did not inform Thorofare about the extent of its disputes with REI, who then accounted for approximately 65% of all revenue Debtor collected from its tenants,[5] before Thorofare refinanced the loan.

The Amended Promissory Note requires Debtor to make monthly interest only payments of $80,883.33 to Thorofare at the non-default rate of interest. *See* Thorofare's Exhibit 14. The

---

[5] *See* Debtor's Cash Flow Statement Profit and Loss, p. 2.

monthly interest accrual increases after a default.  The Amended Loan Agreement obligates Debtor to maintain complete and accurate records for its operations and for Debtor to provide documentation to Thorofare, including a certified monthly rent roll containing specified information within 10 days after the end of each calendar month.[6]  The Amended Loan Agreement contains several representations and warranties made by Debtor, including a representation that there were no defaults on any of Debtor's leases with its tenants at that time.[7]

The Cash Management Agreement provides that Debtor must deposit all payments received from Debtor's tenants into a lockbox account maintained by Thorofare and further provides that, in the event of default, Debtor must direct its tenants to deposit rent and other payments directly into the lockbox account.  To obtain money from the lockbox account to pay for operating expenses, Debtor must obtain Thorofare's approval, which requires a detailed accounting and Debtor's certification.  *See* Thorofare's Exhibit 17, p. 4.

---

[6] The Section 16 of the Amended Loan Agreement provides, in part, as follows:

     (a)     Borrower will maintain full, accurate and complete books of accounts and other records, reflecting the results of the operations of the Property as well as its other operations and will furnish, or cause to be furnished, to lender the following: . . .

          (ii)     within ten (10) days after the end of each calendar month and within forty-five (45) days after the end of each fiscal year, a certified current rent roll, which shall include, among other things, tenant names, lease commencement and expiration dates, square footage, annual rent, annual operating expense and real estate tax contributions, a statement as to whether or not there are any purchase options and/or co-tenancy requirements, and any and all other fees paid by tenants and security deposits currently held, . . .

          (v)     within ten (10) days after the end of each calendar month, a certified profit and loss statement for Railyard Brewing Company, . . .

     (b)     Borrower shall deliver to Lender such additional information regarding Borrower, their business, and the Property within five (5) days after Lender's request therefor. Borrower shall permit Lender to examine such records, books and papers of Borrower which reflect upon its financial condition and the income and expenses of the Project. . . .

Thorofare's Exhibit 15, pp. 19-20.

[7] Section 18 of the Amended Loan Agreement provides, in part, as follows:

Borrower represents, warrants and covenants as follows: . . .

     (d)     . . . Except as otherwise disclosed in writing to Lender, the current Lender, the current Leases are in full force and effect and there are no defaults thereunder by either party and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute defaults thereunder. . . .

Thorofare's Exhibit 15, p. 21.

- 14 -

The financing arrangement between Thorofare and Debtor contemplated cash shortfalls from operations until Debtor achieved higher occupancy of the Market Station building. The Holdback Agreement provided for a $265,000.00 set aside of the loan amount as a "Delta Interest Reserve Holdback" to help debtor service its debt to Thorofare while it was leasing more space. *See* Thorofare's Exhibit 18, pp. 1 – 3. The Holdback Agreement also provided for a $520,000.00 set aside of the loan amount to fund tenant improvements. *See* Thorofare's Exhibit 18, pp. 3 – 4. Under the Holdback Agreement, Debtor could not use more than $300,000.00 of the tenant improvement set aside for improvements to the second floor space leased to Railyard Brewing Company, LLC. *See* Thorofare's Exhibit 18, p. 3. Railyard Brewing Company, LLC and Debtor have common ownership. Debtor's concept is for Railyard Brewing Company, LLC to open a brew pub and bowling alley on the second floor of the Market Station building

Debtor defaulted on the Loan Documents in several respects. Within five months after Thorofare refinanced Debtor's project, the Delta Interest Reserve Holdback was depleted to approximately $18,000.00. Following that, Debtor failed to make any loan payments to Thorofare. Debtor only intermittently provided Thorofare with monthly rent rolls as required under the Amended Loan Agreement. Debtor failed to provide Thorofare with adequate records of its operations as required under the Amended Loan Agreement despite repeated requests from Thorofare. Debtor failed to deposit all rental payments received in May 2015 into the lockbox account. Debtor leased additional space to Railyard Brewing Company, LLC without the prior consent of Thorofare.

The relationship between Debtor and Thorofare soured further after Thorofare sent a letter to Debtor on June 18, 2015 declaring Debtor in default in numerous respects, including those listed above. *See* Thorofare's Exhibit 88. In addition to Debtor's defaults, Debtor's relationship with

- 15 -

Thorofare was strained over a dispute relating to disbursement of tenant improvement funds. Thorofare approved the expenditure of approximately $216,000.00 for improvement to the Railyard Brewing Company, LLC space. Thorofare did not approve disbursement of the remaining funds within the $300,000.00 limit for the following reasons: (1) Debtor was already in default under the Loan Documents; (2) Debtor refused to certify its request for funds; and (3) Thorofare was aware of over $90,000.00 in outstanding invoices for improvements to the Railyard Brewing Company, LLC space, and Thorofare did not believe the remaining funds would be sufficient to complete the tenant improvements. In fact, Mr. Jaramillo estimated at trial that Debtor would need over $120,000.00 to complete the Railyard Brewing Company, LLC space. Nonetheless, Thorofare's denial angered Mr. Jaramillo, who accused Thorofare of "attempt[ing] to steal our property and charge rapacious fees and costs in bad faith." Thorofare's Exhibit 80.

<u>Mr. Jaramillo's Relationship with the City</u>

As found above, the Market Station building is a private/public joint project between the City of Santa Fe and private businesses. Mr. Jaramillo's relationship with the City has been marked with contention. In May 2012, a dispute arose between the City and Debtor resulting in a Settlement Agreement, under which the City purchased a condominium unit from Debtor that comprised approximately 26% of the Market Station building. *See* REI's Exhibit 6. At the time of the City's purchase of the condominium unit, the City and Debtor became members of a condominium association. *See* REI Ex. 5. The condominium association is primarily managed by Mr. Jaramillo. Disputes have arisen between the City and Mr. Jaramillo about whether Mr. Jaramillo has paid condominium association fees; Mr. Jaramillo's failure to keep condominium association funds separate from Debtor's funds; Mr. Jaramillo's failure to timely pay condominium

- 16 -

association expenses; Mr. Jaramillo's failure to maintain adequate records of condominium association expenses; and Mr. Jaramillo's failure to provide documentation when requested.

## Debtor's Relationship with Other Tenants

Debtor has had a total of five tenants who have been open for business for a period of time since opening the Market Station to the public in September 2008: REI; Flying Star Café; Daniella's Closet, Inc.; Marvelous Hair Designs; and Go Wireless. Debtor has had significant disagreements with all but one of these tenants at least once during their tenancy. In one instance the disagreement was so severe that the tenant, Daniella's Closet, Inc., filed a Complaint for Rescission of Lease, for Restitution and Special Damages in state court. *See* Thorofare's Exhibit 70. While the disagreement between Debtor and Daniella's Closet, Inc. that led to litigation was settled, other disagreements have lingered and continued as late as May 2015. *See* Thorofare's Exhibits 36 and 56. Flying Star Café, the project's junior anchor tenant, operated a restaurant in Market Station from 2009-2015 that was second only to REI in terms of square footage at Market Station. Flying Star Café filed a Chapter 11 bankruptcy case in which it rejected its lease with Debtor and closed its Market Station location in in 2015. The president of Flying Star Café described its relationship with Debtor as "conflictive," "contentious," and "exhausting." Finally, Marvelous Hair Designs has not paid rent in over a year due to its dispute with Debtor over an alleged failure to adequately ameliorate smoke damage to its space.

## Debtor's Business with Related Entities

Debtor has frequently conducted business with entities sharing some common ownership with members of the Debtor. Mr. Jaramillo's company, T.R. Power Maintenance, performs routine maintenance work for Debtor. David Duran's company, Builder's Electric Inc., performs electrical work for Debtor. Steve Duran's company, Southwest Structural Services, performs

- 17 -

substantial construction work for Debtor. T.R. Power Maintenance and Builder's Electric Inc. perform common area maintenance for which Debtor charges REI and other tenants. Debtor has never bid out any of the work performed by these related entities to test whether the prices charged are competitive in the marketplace. This has further fostered the suspicion and degradation of trust between REI and Debtor.

Additionally, Debtor entered into a lease with Railyard Brewing Company, LLC owned by Mr. Jaramillo, David Duran, and Steve Duran, to operate a brewpub and bowling alley in the space above REI at the Market Station. Railyard Brewing Company, LLC leases the entire portion of the second floor of the Market Station building not occupied by the City. Debtor expended $216,719.15 of the tenant improvement funds set aside by Thorofare to provide improvements for the space to be occupied by Railyard Brewing Company, LLC. However, to date, Railyard Brewing Company, LLC has not opened for business and has never paid rent.

The Court is not finding that Debtor has given any related entities a sweetheart deal or is favoring related entities to the detriment of the tenants. However, Debtor's continuing transactions with related entities remains a source of suspicion and distrust by Debtor's lender and its anchor tenant.

<u>Current Status of the Market Station Building</u>

Presently, the portion of the Market Station building owned and managed by Debtor is less than 50% occupied by rent paying tenants. Debtor is receiving $57,851.92 in monthly rent, $50,272.17 of which is paid by REI. Debtor has ongoing acrimonious disputes with REI, Marvelous Hair Designs, and Thorofare. Railyard Brewing Company, LLC occupies a 21,100 square foot space on the second floor of the building as well as the 6,596 square foot space on the

- 18 -

first floor formerly occupied by Flying Star Café.  Railyard Brewing Company, LLC is not open for business in either space.

Cause to Appoint a Chapter 11 Trustee

Base on the forgoing, the Court finds cause for the appointment of a Chapter 11 trustee, including, in part, gross mismanagement of the affairs of Debtor by current management.

**DISCUSSION**

Thorofare moves the Court for the appointment of a Chapter 11 Trustee under 11 U.S.C. § 1104(a)(1) and (2) alleging that: (1) cause exists for the appointment of a trustee due to Debtor's gross mismanagement, incompetency, fraud, dishonesty, and the acrimony between Debtor and Thorofare and its tenants; and (2) the appointment of a trustee would be in the best interest of Debtor's creditors, equity security holders, and Debtor's other interest holders.  REI joins in the request to appoint a trustee based on Debtor's failure to produce complete and accurate financial records as required.  REI echoes Thorofare's assertion that appointment of a trustee is in the best interest of Debtor's creditors and interest holders.  Debtor objects to the Motion and asserts that it has managed the Market Station building competently and reasonably under the circumstances and that it has been neither dishonest nor fraudulent.  Because the Court will order the appointment of a trustee under 11 U.S.C. § 1104(a)(1), it need not address whether grounds exist under § 1104(a)(2).

11 U.S.C. § 1104(a)(1) provides:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;

- 19 -

Appointment of a trustee in a chapter 11 case is an extraordinary remedy. It strips a debtor of the rights, powers and duties of a debtor in possession. Courts begin with a strong presumption that the debtor should remain a debtor in possession with the power to continue to control and manage the bankruptcy estate.[8] The movant bears the burden of proof, but the standard of proof the movant must meet is disputed. A clear majority of courts addressing the issue hold that the movant must meet this burden by a clear and convincing standard of proof.[9] However, a sizeable minority of courts hold that the standard of proof is the preponderance of the evidence.[10] While the Tenth Circuit has yet to resolve this controversy, the evidence and testimony admitted at the final hearing meets the more exacting standard of clear and convincing proof, so, the Court need not address this dispute.

The determination of whether cause exists for the appointment of a trustee under § 1104(a)(1) lies within the sound discretion of the bankruptcy court giving due consideration to the various interests affected by the decision.[11] However, once the court determines cause exists, the

---

[8] *In re Celeritas Techs., LLC*, 446 B.R. 514, 518 (Bankr. D. Kan. 2011) ("The appointment of a Chapter 11 trustee is an extraordinary remedy based on a strong presumption in favor of leaving the debtor in possession."); *In re H & S Transp. Co., Inc.*, 55 B.R. 786, 790 (Bankr. M.D. Tenn. 1982) ("[T]here is a strong presumption that the debtor in a Chapter 11 case should continue in control and possession of the business.").

[9] *See e.g., In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 471 (3d Cir. 1998) ("The party moving for appointment of a trustee, in this case the Lenders, must prove the need for a trustee under either subsection by clear and convincing evidence."); *In re Mako, Inc.*, 102 B.R. 809, 811-12 (Bankr. E.D. Okla. 1988) ("For 'cause' to be found by this Court, the movant must prove its existence by a clear and convincing burden of proof."); *In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 173 (Bankr. D. Colo. 1990) ("The burden is on the movant to show by clear and convincing evidence that there is cause to appoint a trustee.").

[10] *See e.g., In re Keeley & Grabanski Land P'ship*, 455 B.R. 153, 163 (B.A.P. 8th Cir. 2011) ("[W]e conclude that the proper standard for a party seeking the appointment of a Chapter 11 trustee is preponderance of the evidence."); *In re Golden Park Estates, LLC*, No. 14-12253 T11, 2015 WL 3643479, at *5 (Bankr. D.N.M. June 11, 2015) ("The Tenth Circuit has not adopted such a standard, and likely would use a preponderance of the evidence standard.").

[11] *See In re G-I Holdings, Inc.*, 385 F.3d 313, 321 (3d Cir. 2004) (applying an abuse of discretion standard of appellate review); *Claimants v. A.H. Robins Co.*, 838 F.2d 239, 242 (4th Cir. 1987) ("due consideration must be given to the various interests involved in the bankruptcy proceeding."). *See also In re H & S Transp. Co., Inc.*, 55 B.R. 786, 790 (Bankr. M.D. Tenn. 1982) ("The final decision as to whether to appoint a trustee rests within the sound discretion of the bankruptcy judge."); *In re Sullivan*, 108 B.R. 555, 556 (Bankr. E.D. Pa. 1989) ("[T]he decision to appoint a trustee is within the discretion of the bankruptcy court.").

- 20 -

court must appoint a trustee.[12] Section 1104(a)(1) provides that "cause" includes fraud, dishonesty, incompetence, and gross mismanagement, but the list is not exhaustive.[13] The Court must consider current management's actions either before or after the commencement of the case. 11 U.S.C. § 1104(a)(1). The decision whether cause exists is fact intensive, and should be made on a case by case basis.[14]

The requirement of "gross mismanagement" contained in § 1104(a)(1) means that simple mismanagement or the mere exercise of poor business judgment alone is insufficient for appointment of a trustee.[15] "After all, it is reasonable to assume that the majority of businesses that arrive in chapter 11 have exercised a certain degree of incompetence or mismanagement."[16] Generally a debtor should be given an opportunity to address problems caused by past mistakes.[17]

In determining the existence of cause, courts should consider enumerated and similar grounds in the context of the totality of the circumstances, including such things as management's competence and the quality of its business decisions, strategies and tactics; the debtor's policies, procedures and accounting practices; any financial improprieties; failure to maintain adequate records or to provide timely reports; the debtor's business with related parties; conflicts of interest; the actual or perceived dishonesty of debtor's management; and acrimony or loss of trust and confidence between the debtor and its creditors or employees or other parties with whom the debtor

---

[12] *See In re Oklahoma Ref. Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988) ("Once the court has found that cause exists under § 1104, it has no discretion but must appoint a trustee.").

[13] *See In re Ford*, 36 B.R. 501, 504 (Bankr. W.D. Ky. 1983) ("[J]udicial considerations in determining the issue of whether to appoint a trustee are not limited to such cause as enumerated specifically in § 1104(a)(1).").

[14] *In re Golden Park Estates, LLC*, 2015 WL 3643470, *6.

[15] *See In re Mako, Inc.*, 102 B.R. 809, 812 (Bankr.E.D.Okla.1988) (simple mismanagement is not enough); *In re St. Louis Globe–Democrat, Inc.*, 63 B.R. 131, 138 (Bankr. E.D. MO. 1985) (poor business judgment alone is not enough).

[16] *St. Louis Globe–Democrat*, 63 B.R. at 138.

[17] *See* Resnick and Sommer, *Collier on Bankruptcy*, ¶ 1104.02[3][c] at 1104-11 (16th ed. 2015) (discussing the same).

does business.[18]  No single circumstance is necessarily determinative, and the importance ascribed to any particular circumstance must be considered in light of the whole.[19]

The Court has carefully considered the totality of circumstances relevant to whether cause exists to appoint a Chapter 11 trustee in light of the strong presumption that a debtor should remain a debtor in possession.  It is clear to the Court that Debtor's management of the Market Station project is well below industry standards, that Debtor has grossly mismanaged the project, and that other factors support appointment of a trustee.

Debtor's management has fallen short with respect its obligations to REI in the administration of the CAM and RPT provisions of the Sublease and its recordkeeping and reporting obligations to Thorofare.  Debtor's management fostered a relationship with its lender, anchor tenant, former junior anchor tenant, and other tenants characterized by distrust and acrimony.  It took Debtor only about five months after the Thorofare refinance in December 2014

---

[18] In the following decisions the court relied upon one or more of the factors listed above to find cause to appoint a trustee under 11 U.S.C. § 1104(a)(1): *In re Oklahoma Ref. Co.*, 838 F.2d 1133 (the debtor's business transactions with related parties, failure to keep adequate records, and failure to make timely and complete reports); *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (acrimony between debtor, conflicts of interest); *Matter of Cajun Elec. Power Co-op., Inc.*, 69 F.3d 746, 751 (5th Cir. 1995) (Emilio M. Garza, dissenting in part) opinion withdrawn in part on reh'g, 74 F.3d 599 (5th Cir. 1996) (Judge Garza's dissent was adopted in place of Part IV of the majority opinion) (the debtor's conflicts of interest); *In re Celeritas Techs.*, LLC, 446 B.R. 514 (acrimony between the debtor and its creditor, failure to satisfy duties of disclosure and transparency, the debtor's management's competence); *Tradex Corp. v. Morse*, 339 B.R. 823, 834 (D. Mass. 2006) (perceived dishonesty of the debtor, failure to make timely and complete reports, and the debtor's business transactions with related parties); *In re Golden Park Estates, LLC*, 2015 WL 3643479, at *5 (failure to maintain adequate records, failure to make prompt and complete reports, and perceived dishonesty of the debtor); *In re Plaza de Retiro, Inc.*, 417 B.R. 632, 641 (Bankr. D.N.M. 2009) (perceived dishonesty of the debtor, acrimony between debtor and its creditors); *In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164 (the debtor's management's competence, loss of confidence in the debtor's management, the debtor's conflicts of interest); *In re La Sherene, Inc.*, 3 B.R. 169, 175 (Bankr. N.D. Ga. 1980) (the debtor's management's competence, the debtor's management's financial improprieties, the debtor's management's poor policies, procedures, and accounting practices).

[19] *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1228 (3d Cir. 1989)  ("Under the discretionary determination of cause required by 11 U.S.C. § 1104(a)(1) and the flexible standard embodied in (a)(2), the court acted within its discretion in concluding that the totality of the circumstances signaled the need for a trustee.").  *See also In re Plaza de Retiro, Inc.*, 417 B.R. at 640 ("The Court's task is to determine whether the totality of the circumstances warrant appointment of a trustee.").

to cease paying debt service to Thorofare, after Debtor burned through the interest reserve created as a cushion to allow Debtor to continue to make debt service while leasing more of its space. It took Debtor less time than that to default in its reporting obligations to Thorofare. In August 2015, Debtor's management lost Debtor's computerized business records to a corrupted hard drive, did not keep a back-up, and cannot find the hard copies. Debtor has not made an appropriate effort to recover the lost data. Debtor failed to competitively bid any of the services provided by its insiders for which Debtor passes on costs to tenants in the form of common area maintenance charges. After more than seven years, there remains a low occupancy rate in the Market Station building by paying tenants. Debtor's monthly revenue is not nearly enough to pay interest only on the Thorofare loan at the non-default rate, even if Debtor paid none of its other operating expenses.

Debtor's actions relating to its obligation to provide its anchor tenant REI with CAM and RPT estimates and reconciliations are particularly egregious. Currently, REI accounts for about 85% of Debtor's monthly revenue. Although the Sublease required REI to continue to pay its share of CAM and RPT expenses based on Debtor's last reasonable estimate, this did not excuse Debtor from failing to give a new estimate each year when it became apparent that its last estimate was grossly overstated. Nor is there any excuse for Debtor failing to provide timely annual CAM and RPT reconciliations. Debtor waited until REI demanded an audit to issue its first three CAM and RPT reconciliations, for 2009, 2010 and 2011, years after they were due, which showed according to Debtor's numbers that it had been collecting some 240% of REI's actual share of the expenses for those three years. Even then, Debtor failed to support the reconciliations with the required documentation. And even now, the documentation Debtor has provided REI to support its 2009, 2010 and 2011 CAM charges is grossly deficient. Debtor has still provided no supporting documentation for CAM charges in 2008 and 2012, and its documentation supporting its 2013 and

2014 "annual" CAM reconciliations provided in December 2015 is incomplete. Had Debtor provided the documentation timely, it would not be in its current predicament, scrambling to obtain records from third parties after having lost its own records.

Debtor's failure to properly administer it obligations regarding CAM and RPT charges has resulted in REI offsetting substantial amounts against base rent, and its continued payment of estimated CAM and RPT amounts into its attorney trust account, which now totals some $295,000. Instead of accepting responsibility for its shortcomings, Debtor's management threated REI with going to the press and applying political pressure.

Giving particular weight to management's competence; the quality of Debtor's business decisions; Debtor's failure to maintain adequate records or provide timely reports; Debtor's business with related parties; and the acrimony and loss of trust and confidence between Debtor and its lender and anchor tenant, the Court has determined that there exists cause to appoint a Chapter 11 trustee.

## CONCLUSION

Based on the foregoing, the Court will enter an order (1) granting the Motion insofar as it requests appointment of a trustee and (2) ordering that a trustee be appointed.


ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: March 30, 2016

- 24 -

Copy to:

Henry M. Bohnhoff
Rodey, Dickason, Sloan, Akin & Robb, P.A
P.O. Box 1888
Albuquerque, NM 87103

William F. Davis
6709 Academy NE, Suite A
Albuquerque, NM 87109

Katharine C. Downey
Sutin Thayer & Browne, A.P.C.
PO Box 1945
Albuquerque, NM 87103-1945

Christopher D. Dvorak
6709 Academy NE, Suite A
Albuquerque, NM 87109

Charles R. Hughson
Rodey, Dickason, Sloan, Akin & Robb, P.A
P.O. Box 1888
Albuquerque, NM 87103-188

Jacqueline Ortiz
Sutin Thayer & Browne
Post Office Box 1945
Albuquerque, NM 87103-1945

Alice Nystel Page
Office of U.S. Trustee
PO Box 608
Albuquerque, NM 87103-0608

Benjamin E. Thomas
Sutin, Thayer & Browne
PO Box 1945
Albuquerque, NM 87103