UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:   Railyard Company, LLC,

Debtor.                                        No. 15-12386-t11

## CHAPTER 11 TRUSTEE'S MOTION FOR ORDER: (A) AUTHORIZING SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF COMMERCIAL LEASES AND ASSIGNMENT OF GROUND LEASE; (C) APPROVING MARKETING PLAN (D) APPROVING SALE PROCEDURES; AND (E) SETTING AUCTION DATE FOR SALE OF ESTATE ASSETS

Chapter 11 Trustee Craig H. Dill (the "Trustee"), by counsel and pursuant to 11 U.S.C. § 363, for his Motion for Order: (A) Authorizing Sale of Estate Assets Free and Clear of All Liens, Claims and Encumbrances, (B) Authorizing Assumption and Assignment of Commercial Leases and Assignment of Ground Lease, (C) Approving Marketing Plan; (D) Approving Sale Procedures, and (E) Setting Auction Date for Sale of Estate Assets (the "Motion"), states:

### BACKGROUND

1.     The Court has jurisdiction over this case and this motion pursuant to 28 U.S.C. §§ 157(a), (b)(1), and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157 (b)(2)(N).

2.     Venue is proper in this District, pursuant to 28 U.S.C. §§ 1408 and 1409(a).

3.     On September 4, 2015 (the "Petition Date"), Railyard Company, LLC (the "Debtor") voluntarily filed for bankruptcy relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court District of New Mexico (the "Bankruptcy Court"), commencing Case No. 15-12386-t11 (the "Bankruptcy Case").

4.     The Trustee was appointed as the Chapter 11 Trustee of the Debtor's bankruptcy estate (the "Estate") on July 13, 2016. *See* Memorandum Opinion and Order Approving Second

Application for Approval (Doc. No. 308).

5.     The primary assets (the "Assets") of the Estate consist of the following:

A.     An Amended and Restated Ground Lease (the "Ground Lease") dated October 1, 2007 between Santa Fe Railyard Community Corporation, a New Mexico non-profit corporation ("SFRCC"), as ground lessor, and the Debtor, as ground lessee;

B.     Condominium Units 1, 3, and 4 located at 500 Market Street, Santa Fe, New Mexico (together with the Ground Lease, the "Real Property");

C.     Certain furniture, fixtures, and equipment owned by the Estate and located at 500 Market Street, Santa Fe, New Mexico; and

D.     Unexpired commercial subleases between the Debtor and Recreational Equipment, Inc.; Go Wireless, Inc.; and Daniella's Closet, Inc. (the "Commercial Leases").

6.     The Debtor's largest creditor, Thorofare Asset Based Lending Fund III, L.P. ("Thorofare") has a claim secured by the Assets pursuant to a Leasehold Mortgage and Security Agreement executed by Debtor in favor of the original lender, Market Station Railway Properties, LLC, recorded on May 1, 2008 in the real property records of Santa Fe County, New Mexico as Instrument No. 1524276, and assigned to Thorofare on December 4, 2014 by Debtor's Assignment of Leasehold Mortgage, recorded on December 15, 2014 in the real property records of Santa Fe County, New Mexico as Instrument No. 1753012 (the "Mortgage").[1]

7.     As of June 20, 2017, Thorofare has asserted that the outstanding principal balance of its loan, secured by the Mortgage, is $9,215,228.63, plus accrued but unpaid interest of $1,632,270.58 at the non-default rate of 10.0%; plus accrued but unpaid interest of $1,330,247.78

---

[1] The other alleged secured creditor, which is junior to Thorofare, is Sommer, Udall, Sutin, Hardwick & Hyatt, P.A. for an attorneys' lien in the amount of $132,899.78. *See* Claim No. 5, filed on October 6, 2015. No other secured party has filed a proof of claim in this case and no liens of record have priority to Thorofare's Mortgage.

at the default rate of 7.0%; an exit fee in the amount of $563,546.94; late charges in the amount of $16,116.66; attorneys' fees and servicer expenses in the amount of $698,007.82; plus interest as it continues to accrue at $2,477.21 per diem at the non-default rate and $1,734.05 per diem at the default rate for a total per diem of $4,211.26 (the "Thorofare Debt"). *See also* Thorofare's Proof of Claim, Claim No. 9, filed on December 11, 2015.

8. On May 26, 2017, the Trustee filed an application (the "Employment Application") to employ Barker Realty, LLC ("Barker") and NMREA, Inc d/b/a Colliers International ("Colliers") (together, the "Brokers") as sales brokers for the Assets pursuant to the terms of the exclusive right to sell listing agreement (the "Listing Agreement") attached to the Employment Application. *See* Doc No. 608. The Employment Application is currently pending.

## SALE OF ASSETS UNDER SECTION 363 OF THE BANKRUPTCY CODE

9. The Trustee requests that the Court authorize the sale of the Assets pursuant to Section 363 of the Bankruptcy Code free and clear of all liens, claims, and encumbrances, with such liens, claims, and encumbrances to attach to the sale proceeds.

10. Section 363(b) of the Bankruptcy Code authorizes the sale of property of the estate other than in the ordinary course of business after notice and a hearing. A sale of assets outside the ordinary course of business is a matter within the Court's discretion. Courts generally permit a debtor to sell property of the estate outside the ordinary course where the proposed sale is a sound exercise of the Trustee's business judgment and when such sale is for fair and reasonable consideration and is in good faith. See, e.g. *In re Premier Concrete, LLC,* 2010 WL 1780046 (Bankr.D.N.M. 2010) (citing e.g. *In re General Motors Corp.,* 407 B.R. 463, 493–94 (Bankr.S.D.N.Y. 2009); *In re Derivium Capital, LLC,* 380 B.R. 392, 404 (Bankr.D.S.C.2007); *In re Psychrometric Systems, Inc.,* 367 B.R. 670, 674 (Bankr.D.Colo.2007).

- 3 -

11.     The sale of the Assets is outside the ordinary course of the Debtor's business.

12.     The Trustee has determined that, in his business judgment, the sale of the Assets in accordance with the Marketing Plan and Sale Procedures proposed herein will maximize the value of the Estate and is in the best interest of the Estate and creditors.

13.     Therefore, the Trustee respectfully requests that the Court approve the sale of the Assets in accordance with the proposed Marketing Plan and Sale Procedures outlined below.

## ASSUMPTION AND ASSIGNMENT OF COMMERCIAL LEASES AND ASSIGNMENT OF GROUND LEASE UNDER SECTION 365 OF THE BANKRUPTCY CODE

14.     The Trustee requests that the Court approve and authorize the assumption of the Commercial Leases and assignment of the Commercial Leases and the Ground Lease to the Buyer pursuant to Section 365 of the Bankruptcy Code.

15.     Bankruptcy Code § 365(a) provides that a trustee, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  The assumption or rejection of an unexpired lease by a trustee is subject to review under the business judgment standard. *See In re Chi-Feng Huang*, 23 B.R. 798, 800 (B.A.P. 9th Cir. 1982) ("The great weight of modern authority holds that whether an executory contract should be rejected is a matter within the business judgment of the trustee."). If the trustee's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease. *See, e.g., NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 523 (1984).

16.     Bankruptcy Code § 365(f) provides that a trustee may assign an executory contract or unexpired lease assumed under the provisions of that Code Section. The Trustee will require any potential assignee to provide adequate assurance of its future performance under the Commercial Leases and the Ground Lease as required by 11 U.S.C. § 365(f)(2)(B).

17.     The Trustee has determined that, in his business judgment, the assumption of the

- 4 -

Commercial Leases and the assignment of the Commercial Leases and assignment of the Ground Lease in accordance with the Sale Procedures proposed herein will maximize the value of the Estate and is in the best interest of the Estate and creditors.

18.     Therefore, the Trustee respectfully requests that the Court approve the assumption of the Commercial Leases and the assignment of the Commercial Leases and assignment of the Ground Lease in accordance with the proposed Marketing Plan and Sale Procedures outlined below.

## MARKETING PLAN

19.     The Trustee requests that the Court authorize the Trustee to implement the following marketing plan (the "Marketing Plan") formulated by the Brokers from the date of this Motion through September 15, 2017 (the "Marketing Period"):

A.      Brokers will create comprehensive marketing materials for the Assets;

B.      Brokers will compile all available due diligence information for the Assets;

C.      Brokers will place signs on the Real Property advertising the Assets for sale;

D.      Brokers will advertise the Assets on the local listing services;

E.      Brokers will market the Assets on Loopnet.com, CCIM.net, the Society of Industrial and Office Realtors website, and the Colliers International networks, as well as a proprietary web site hosted at www.500market.com or www.500MarketSt.com;

F.      Brokers will have all marketing and due diligence materials for the Assets available for download on the proprietary website hosted at www.500market.com or www.500MarketSt.com.

20.     Under the Marketing Plan, the Assets will be exposed to local, regional, national, and international markets from the date this Motion is granted through September 15, 2017 on

- 5 -

several different channels. Prospective buyers will have instant access to all marketing and due diligence information via the proprietary website. The Marketing Plan will provide proper exposure of the Assets to the market required for a sale under 11 U.S.C. § 363. *See In re Angel Fire Water Co., LLC, 2015 WL 251570*, at *2 (Bankr. D.N.M. Jan. 20, 2015) (when determining whether to approve a sale under Section 363, courts should consider whether property was properly exposed to the market).

21.     Therefore, the Trustee respectfully requests that the Court approve the Marketing Plan.

## SALE PROCEDURES

22.     The Trustee requests that the Court approve the following sale procedures:

A.     Marketing Period. The Trustee will solicit bids for the sale of the Assets during the Marketing Period.

B.     Bid Deadline. Bids must be actually received by the Trustee no later than 4:30 pm, MT, on September 15, 2017 (the "Bid Deadline").

C.     Bidding Requirements. To be a "Qualified Bidder," a person or entity (a "Potential Bidder") must, on or before the Bid Deadline, deliver to the Trustee the "Bid Materials," which consist of the following:

(1)     An executed confidentiality and non-use agreement with respect to the Assets ("Confidentiality Agreement") in a form substantially similar to the form attached hereto as Exhibit A;

(2)     A bid or proposal (a "Bid") to purchase the Assets that:

a.  contains substantially the same terms and conditions as the form of Asset Purchase Agreement attached hereto as Exhibit B;

- 6 -

b. does not contain financing contingencies of any kind;

c. does not consist of any form of consideration other than cash consideration, payable by wire transfer of immediately available funds to the account or accounts designated in writing by the Trustee;

d. is not retracted or withdrawn in writing to the Trustee on or before the Auction Date (as defined herein);

e. has not been otherwise determined by the Trustee to be made in bad faith; and

f. is accompanied by a clean and a duly executed copy of the Asset Purchase Agreement and the documents set forth as schedules and exhibits thereto, along with copies that are marked to reflect the amendments to and modifications from the Asset Purchase Agreement, which amendments and modifications may not be materially more burdensome to the Estate.

(3) Written proof that SFRCC has approved Potential Bidder as an assignee of the Ground Lease;

(4) Written proof by the Potential Bidder that it has received debt or equity funding commitments or has available cash sufficient in aggregate to finance the purchase contemplated or has other ability to close the proposed transaction in form and substance satisfactory to the Trustee;

(5) Adequate assurance of the Potential Bidder's ability to perform under the Ground Lease and Commercial Leases; and

(6) A good faith deposit in the amount of $150,000.00 (the "Good Faith Deposit") payable to the Walker & Associates, P.C. Attorney Trust Account.

D. <u>Stalking Horse Bidder</u>. The Trustee will be authorized, but not required, to enter into a stalking horse agreement (a "Stalking Horse Agreement") at any time before the Bid Deadline with a Qualified Bidder for the purpose of establishing a Stalking Horse Bid. In the event that the Trustee enters into a Stalking Horse Agreement, the Trustee shall promptly file a notice

- 7 -

with the Court that includes a copy of such agreement, and provide a copy of such agreement to any Potential Bidder upon request. The Stalking Horse Agreement may include an agreement by the Trustee to pay a break-up fee (the "Break-Up Fee") of up to One Percent (1%) of the Successful Bid (as defined below) in the event that: (1) the Stalking Horse Bidder is not in default under the Stalking Horse Agreement, (2) The Stalking Horse Bidder has not terminated its bid prior to the Auction, and (3) the Stalking Horse Bidder is not determined to be the Successful Bidder (as defined below) at the Auction.

E.     <u>Opportunity to Cure Defects in Bids</u>. Potential Bidders who submit their Bid Materials no later than 5:00 p.m. MT on September 5, 2017 shall be notified by the Trustee no later than 5:00 p.m. MT on September 9, 2017 whether such Potential Bidder has submitted Bid Materials in an acceptable form, and will have the opportunity to cure any defects before the Bid Deadline.

F.     <u>Notification of Qualified Bidder Status.</u> By September 20, 2017, the Trustee shall determine which Bids are deemed to be Qualified Bids and which Potential Bidders are Qualified Bidders and will notify the Qualified Bidders whether any Bids submitted constitute Qualified Bids. Any Bid that is not deemed a Qualified Bid shall not be considered by the Trustee. Thorofare is deemed to be a Qualified Bidder, is exempt from the Good Faith Deposit requirement, and shall be entitled to credit bid (the "Credit Bid") at the Auction as provided in 11 U.S.C. §363(k).

G.     <u>Obtaining Due Diligence Access</u>. The Due Diligence Deadline is September 15, 2017. After receipt of an executed Confidentiality Agreement and until the Due Diligence Deadline, the Trustee shall provide each Potential Bidder with reasonable access to the Assets to enable the Potential Bidder to conduct due diligence. The Trustee shall reasonably cooperate with requests for additional information. The Trustee may decline to provide access to the Assets to

- 8 -

Potential Bidders who the Trustee, in his reasonable business judgment, determines do not intend in good faith to consummate a purchase of the Assets.

H. <u>Disclosure to Thorofare.</u> Trustee shall provide copies of all Bid Materials to Thorofare.

I. <u>Evaluation of Qualified Bids and Identification of Starting Bid.</u> Prior to the Auction, the Trustee shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Trustee's judgment, the highest or otherwise best bid (the "Starting Bid"). No later than September 21, 2017, the Trustee shall: (i) notify all Qualified Bidders which Qualified Bid is the Starting Bid and (ii) distribute copies of the Starting Bid and all other Qualified Bids received. The Trustee shall not distribute confidential or financial information submitted pursuant to Paragraph C(3) herein.

J. <u>Auction Date.</u> The Auction shall commence on October 3, 2017 at 10:00 A.M. MT (the "Auction Date") at the United States Bankruptcy Court, 500 Gold Ave. SW, Albuquerque, NM 87102, or such other time or other place as the Trustee shall timely notify the Qualified Bidders.

K. <u>Auction Procedures.</u> The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

(1) The Qualified Bidders shall appear in person, or through duly-authorized representatives at the Auction, or via telephone with the prior written approval of the Trustee;

(2) Only such authorized representatives of each of the Qualified Bidders, the Trustee, and their respective advisors shall be permitted to attend the Auction;

(3) Only Qualified Bidders and their duly authorized representatives shall be entitled to bid at the Auction;

- 9 -

(4)     Bidding at the Auction shall begin at the Starting Bid;

(5)     Subsequent bids at the Auction shall be made in minimum increments of $50,000.00;

(6)     The bidding will be recorded to ensure an accurate record of the bidding at the Auction;

(7)     Each Qualified Bidder will be required to confirm on the record of the Auction that it has not colluded with any other person with respect to the bidding or the sale; and

(8)     The Auction shall be governed by such other Auction Procedures as may be announced by the Trustee, after consultation with his advisors, from time to time on the record at the Auction; *provided,* that any such other Auction Procedures shall not be inconsistent with any order of the Bankruptcy Court.

L.     <u>Acceptance of the Successful Bid</u>. Upon the conclusion of the Auction, the Trustee, in the exercise of his reasonable, good-faith business judgment, and after consulting with his advisors, shall identify the highest or otherwise best bid (the "Successful Bid"). The Qualified Bidder having submitted the Successful Bid will be deemed the "Successful Bidder." The Successful Bidder and the Trustee shall, no later than October 20, 2017, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which such Successful Bid was made.

M.     <u>Carve-Out if Thorofare is the Successful Bidder.</u> In the event that Thorofare becomes the Successful Bidder by its Credit Bid, Thorofare shall contribute funds in the amount of $400,000.00, plus other funds in the Estate, including but not limited to Rents, and recoveries from current and former tenants (together, the "Carve-Out") to pay unsecured creditors a fixed amount to be determined by the Court, and to pay the allowed administrative claims for the

- 10 -

Trustee's commission, reimbursement of expenses, attorneys' fees, costs of liquidation, taxes, and general administrative costs (the "Allowed Administrative Claims").

N.  <u>Sale Hearing</u>. A hearing to consider approval of the Sale of the Assets to the Successful Bidder (the "Sale Hearing") shall be held on October 3, 2017 after the Auction. At the Sale Hearing, the Trustee shall present the Successful Bid to the Bankruptcy Court, and request the entry of an order approving the Successful Bid.

O.  <u>Designation of Back-Up Bidder</u>. Upon the conclusion of the Auction and the selection of the Successful Bidder, the Trustee shall select the next highest or otherwise best Qualified Bid, which may be Thorofare's Credit Bid if it exceeds the amount of any other cash bid made at the Auction (the "Back-Up Bid" and the party submitting the Back-Up Bid, the "Back-Up Bidder"). The Back-Up Bid shall remain open until the earlier of the first Business Day following the closing of a sale of the Acquired Assets to the Successful Bidder. If the Successful Bidder does not timely close, and if Thorofare is the Back-Up Bidder, Thorofare shall be deemed the Successful Bidder and the Trustee shall promptly present it to the Bankruptcy Court. If the Back-Up Bidder other than Thorofare does not timely close, and if Thorofare has submitted a Credit Bid, Thorofare shall be deemed the Successful Bidder. If approved by the Bankruptcy Court, closing shall occur and the Back-Up Bidder shall no later than October 27, 2017, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which such Back-Up Bid was made.

P.  <u>Payment of Break-Up Fee.</u> If there is a Stalking Horse Bid, and the Stalking Horse Bidder is entitled to the Break-Up Fee, the Trustee shall pay to the Stalking Horse Bidder, by wire transfer in immediately available funds to an account designated by the Stalking Horse Bidder, the Break-Up Fee. This payment shall be made within five (5) Business Days after the Auction.

- 11 -

Q. <u>Return of Good Faith Deposit</u>. Any Good Faith Deposit of the Successful Bidder shall, upon consummation of the purchase of substantially all of the Assets, be credited to the purchase price paid for the Assets. If the Successful Bidder fails to consummate the purchase of all of the Acquired Assets, then the Good Faith Deposit shall be forfeited to the Estate. The Good Faith Deposit of any unsuccessful Qualified Bidders will be returned within five (5) business days after the Auction, unless the unsuccessful Qualified Bidder is designated as the Back-Up Bidder, in which case the Good Faith Deposit will be returned within five (5) business days after consummation of the sale to the Successful Bidder.

R. <u>Modification of Sale Procedures</u>. The Trustee may modify these Sale Procedures in any manner that is not inconsistent with any order entered by this Court and that will best promote the goals of the bidding process and to impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation, modifying the requirements for a Qualified Bid, extending the deadlines set forth in these Sale Procedures, adjourning or cancelling the Auction or adjourning the Sale Hearing in open Bankruptcy Court without further notice, and rejecting any or all Qualified Bids, if, in the Trustee's business judgment the Trustee determines that such Qualified Bid is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or any related rules or the terms set forth herein, or (iii) contrary to the best interests of the Estate.

23.     The Trustee respectfully requests that the Court approve the Sale Procedures.

## SALE FREE AND CLEAR OF ALL LIENS

24.     Section 363(f) of the Bankruptcy Code authorizes a trustee to use, sell or lease property of the estate outside of the ordinary course of business free and clear of any interest in such property. The Assets should be sold to the Successful Bidder free and clear of all liens, claims

- 12 -

and encumbrances with any such liens, claims and encumbrances to attach to the net sale proceeds with the same validity, priority, force, and effect that such liens, claims and encumbrances had on such assets prior to the closing of the proposed sale.

25.     The Trustee reserves the right to object to all claims, and to the validity, extent, or priority of any such claims. Grounds exist under Section 363(f) of the Bankruptcy Code for a sale of the Assets free and clear of liens, interests, claims and encumbrances. Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if – (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

26.     Thorofare consents to this Motion.

27.     The Trustee requests the Court approve the sale of the Assets free and clear of all liens, interests, claims and encumbrances under 11 U.S.C. § 363(f).

## THE SUCCESSFUL BIDDER SHOULD BE AFFORDED ALL PROTECTIONS UNDER 11 U.S.C. § 363(m) AS A BUYER IN GOOD FAITH

28.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from the Estate even when the sale is later reversed on appeal:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

29.     The Trustee will present evidence at the Sale Hearing that the selection of the Successful Bidder shall have been the product of arm's-length negotiations in a competitive sale

- 13 -

process. Accordingly, the Trustee requests that the Court make a finding at the Sale Hearing that the Successful Bidder has purchased the Assets in good faith and is entitled to the full protections of Section 363(m).

WHEREFORE, the Trustee respectfully requests entry of an order:

A.    Authorizing the sale of the Assets pursuant to 11 U.S.C. 363(f);

B.    Authorizing the Trustee to assume and assign the Commercial Leases and assign the Ground Lease;

C.    Authorizing the Trustee to implement the Marketing Plan described herein;

D.    Approving the Sale Procedures described herein;

E.    Scheduling the Auction on October 3, 2017 at 10:00 a.m. MT; and

F.    Granting Trustee all other just and proper relief.

Respectfully submitted,

WALKER & ASSOCIATES, P.C.


By: */s/ filed electronically 06/27/2017*
    Thomas D. Walker
    500 Marquette Ave NW, Suite 650
    Albuquerque, NM 87102
    Telephone: (505) 766-9272
    Facsimile: (505) 766-9287
    e-mail: twalker@walkerlawpc.com
    *Attorneys for Trustee Craig H. Dill*

I hereby certify that, on June 27, 2017,
in accordance with NM LBR 9036-1 and
Fed. R. Civ. P. 5(b)(3), a true copy of the
foregoing was served via the Court's CM/ECF
notification facilities to those parties who are
registered CM/ECF participants in this case.

*s/ filed electronically 6/27/2017*
Thomas D. Walker

- 14 -

**Asset Purchase Agreement**

**by and among**

**CRAIG H. DILL, CHAPTER 11 TRUSTEE**

**of the Bankruptcy Estate of Railyard Company, LLC**

**a New Mexico limited liability company,**

**Debtor in Chapter 11 Bankruptcy Case Number 15-12386-t11**

**Pending in the United States Bankruptcy Court for the District of New Mexico**

**and**

**[BUYER],**

**[ENTITY TYPE], or its assignee**

Exhibit A

**ASSET PURCHASE AGREEMENT**

This **ASSET PURCHASE AGREEMENT** is made and entered into as of the later of the dates indicated next to the signature lines of Buyer and Seller on the signature page to this Agreement (the "Agreement Date") by and among **[Buyer], a [jurisdiction] [entity],** ("Buyer"), and **Craig H. Dill** ("Seller") **acting solely and exclusively in his capacity as the duly appointed Chapter 11 Trustee of the Railyard Company, LLC** (the "Debtor") **Bankruptcy Estate** (the "Estate"**), Case Number 15-12386-t11, United States Bankruptcy Court for the District of New Mexico**.

**WHEREAS**, Debtor filed a voluntary petition under Chapter 11 (the "Bankruptcy Petition") of the United States Bankruptcy Code, 11 U.S.C. §101, et seq. (the "Bankruptcy Code"), on September 4, 2015 (the "Petition Date"), in the United States Bankruptcy Court for the District of New Mexico, (the "Bankruptcy Court") initiating Case Number 15-12386-t11 (the "Bankruptcy Case"); and

**WHEREAS**, Craig H. Dill was appointed Chapter 11 Trustee in the Bankruptcy Case and continues to serve as Trustee; and

**WHEREAS**, Seller desires to sell and assign to Buyer, and Buyer desires to purchase and assume from Seller, certain assets of the Estate on the terms set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party, the parties, intending legally to be bound, agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1     As used in this Agreement, the following capitalized terms used herein but not otherwise defined shall have the following meanings:

*"Actual knowledge"* means, knowledge actually known by the person, individually, and not constructively or vicariously or by agency; the term "actual knowledge" expressly excludes information or knowledge that the person should have known or could have known through investigations or inquiries that such person did not undertake. It is expressly understood and agreed that the Seller's actual knowledge does not include and shall not be construed to include knowledge of Debtor that is not actual knowledge of Seller; however, actual knowledge of Seller does include the actual knowledge of its professional advisors including, without limitation, the actual knowledge of Seller's legal counsel.

*"Agreement"* means this Asset Purchase Agreement, together with all Exhibits attached hereto, as the same may be amended, supplemented, or modified from time to time.

*"Business Day"* means any day other than Saturday, Sunday, or any other day on which banks in Albuquerque, New Mexico are required or permitted by Law to close.

*"Commercial Leases"* means the leases identified on **Exhibit A** attached hereto.

"*Contracts*" means all vendor contracts and service contracts, as of the filing of the Bankruptcy Petition.

"*Final Sale Order*" means: (a) a Sale Order entered by the Bankruptcy Court which has not been stayed pending appeal, and which includes a finding that the Buyer purchased the Acquired Assets in good faith pursuant to 11 U.S.C. § 363(m); or (b) a Sale Order as to which the time to appeal or to seek reconsideration or certiorari has expired, and no appeal, petition for certiorari, or motion for reconsideration has been timely filed, or as to which any appeal that has been taken, or a petition for certiorari that has been filed, or a motion for reconsideration that has been filed, has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought, or reconsideration, re-argument, or rehearing sought, shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

"*Governmental Entity*" means any nation or government, supranational body, state, or political subdivision thereof (including the United States or any other country or federal, state, local or municipal subdivision thereof), and any court or administrative agency or other regulatory body, instrumentality, authority or other entity or official thereof exercising executive, legislative, judicial, regulatory, or administrative functions thereof.

"*Ground Lease*" means the Amended and Restated Ground Lease dated October 1, 2007 between Santa Fe Railyard Community Corporation, a New Mexico non-profit corporation, as Lessor, and Railyard Company, LLC, as Lessee, as amended by the First Amendment to Ground Lease effective as of May 18, 2012.

"*Law*" means, any U.S. federal, state or local, and any foreign national, state or local, law, statute, common law, ordinance, code, treaty, rule, regulation, order, ordinance, permit, license, writ, injunction, directive, determination, judgment or decree or other requirement of any Governmental Entity or arbitrator, in each case, applicable to the Acquired Assets.

"*Lien*" means any interests, levies, claims, charges, assessments, mortgages, security interests, liens, pledges, conditional sales agreements, title retention contracts, leases, subleases, rights of first refusal, options to purchase, licenses, and other restrictions or commitments to create or suffer any of the foregoing, whether known or unknown, existing, or inchoate, contingent or disputed.

"*Marketing Plan*" means the plan for advertising the Acquired Assets as described in the Sale Motion.

"*Material*" means of such a nature that knowledge of the item or information would affect a reasonable person's decision-making.

"*Person*" means any individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, governmental body or authority or any other entity.

"*Personal Property*" means the personal property described on **Exhibit A** attached hereto.

"*Property*" means the Personal Property and the Real Property.

"*Real Property*" means that portion of the Acquired Assets which is not personal property.

2

*"Sale Procedures"* means the sale and auction procedures described in the Sale Motion.

*"SFRCC"* means the Santa Fe Railyard Community Corporation.

*"Taxes"* means all taxes, assessments, fees, levies, duties, tariffs, or governmental impositions payable to any federal, state, local or foreign Governmental Entity or taxing authority, including interest, penalties, fines, additions to tax and additional amounts imposed with respect thereto.

*"Transaction Documents"* means the Final Sale Order, any assignment agreements necessary to transfer the Ground Lease and Commercial Leases, and any other agreements, instruments, certificates or other documents delivered pursuant to or in connection with this Agreement or any other such agreement, instrument, certificate or other document necessary for Buyer to get the full benefit of the Acquired Assets, including without limitation, building plans, keys, access and pass codes, warranties, manuals, maintenance records, and the like.

## ARTICLE II
## PURCHASE AND SALE OF ACQUIRED ASSETS

2.1     Acquired Assets. Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Seller agrees to sell, transfer, convey, assign and deliver to Buyer, and Buyer agrees to purchase, accept, and assume all of the assets described in **Exhibit A** to this Agreement (collectively, the "Acquired Assets") free and clear of all Liens.

## ARTICLE III
## EARNEST MONEY; PURCHASE PRICE; CLOSING

3.1     Earnest Money.

(a)     Buyer agrees to deliver to Walker & Associates, P.C. Attorney's Trust Account, as escrow agent (the "Escrow Agent") or its successor Escrow Agent, as may be designated by Seller, within three (3) Business Days after the Agreement Date the amount of One Hundred and Fifty Thousand Dollars ($150,000.00) as earnest money (together with any interest that may accrue thereon, shall be collectively referred to as the "Earnest Money").

(b)     The Earnest Money shall be applied toward and be a credit against the Purchase Price at Closing. The Escrow Agent shall pay the applicable amount of Earnest Money to the settlement agent at Closing (if not Escrow Agent), or shall disburse the Earnest Money as otherwise expressly provided herein.

(c)     The Earnest Money shall be refundable to Buyer until the expiration of the Due Diligence Period (as defined in Section 4.1 below). If, after the expiration of the Due Diligence Period, Buyer has not provided written notice of termination to Seller, the Earnest Money shall become nonrefundable.

(d)     Notwithstanding Section 3.1(c) above, Earnest Money shall be refundable to Buyer after the expiration of the Due Diligence Period if this Agreement is terminated or the transaction contemplated by this Agreement fails to be consummated as a result of: (1) a Default by Seller; or

3

(2) the failure of one or more of the Buyer Conditions to be satisfied to the reasonable satisfaction of Buyer as set forth in **Section 7.1**.

(e)     The Escrow Agent's duties and responsibilities shall be limited to holding the Earnest Money and disbursing the Earnest Money in accordance with the terms and provisions set forth in this Agreement. In the event that (i) any dispute shall arise between the parties with respect to the disposition or disbursement of the Earnest Money, or (ii) the Escrow Agent shall be uncertain as to how to proceed in a situation not explicitly addressed by the terms of this Agreement whether because of conflicting demands by the other parties hereto or otherwise, the Escrow Agent shall be permitted to interplead the Earnest Money held hereunder into the registry of the Bankruptcy Court, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets. The Seller and Buyer further agree to pursue any redress or recourse in connection with such a dispute, without making the Escrow Agent a party to same.

3.2     Purchase Price. As consideration for the purchase of the Acquired Assets, and in addition to assuming any Assumed Liabilities, on the Closing Date, subject to the terms and conditions hereof, the Buyer shall pay to Seller:

(a)     _____ Dollars ($_____) (the "Purchase Price"). The Purchase Price, after crediting the Earnest Money in accordance with **Section 3.1** and subject to the prorations and adjustments described herein, shall be paid by Buyer to Seller in immediately available funds on the Closing Date.

3.3     Closing. The closing of the sale and purchase of the Acquired Assets (the "Closing") shall take place at the offices of the Escrow Agent, as defined herein, within ten (10) Business Days following the date that the order approving the sale contemplated in this Agreement becomes a Final Sale Order, or at such other time, date and location as Buyer and Seller agree in writing (the "Closing Date"). Upon Closing, all proceeds will be paid to the Bankruptcy Estate.

## ARTICLE IV
## DUE DILIGENCE; SELLER COOPERATION

4.1     Due Diligence. Buyer shall have from the Agreement Date until 5:00 p.m., MST, on September 15, 2017 (the "Due Diligence Period") within which to investigate and examine all aspects of the Acquired Assets and the transaction contemplated herein. In the event Buyer, in its sole and absolute discretion, for any reason or no reason, determines not to proceed with the purchase of the Acquired Assets pursuant to this Agreement, Buyer may, in its sole discretion, terminate this Agreement by sending written notice of termination to Seller prior to the expiration of the Due Diligence Period. In the event of such termination, the Earnest Money shall be returned to Buyer in accordance with **Section 3.1(c)** above.

4.2     Access to Information. Upon Buyer's delivery to Seller of an executed confidentiality agreement in a form acceptable to Seller ("Confidentiality Agreement"), a form of which is attached hereto as **Exhibit B**, Seller shall provide or give reasonable access to Buyer within five (5) Business Days following the Agreement Date copies of the information identified on **Exhibit C**, to the extent that such information is in Seller's possession. In addition, during the Due Diligence Period, Seller shall provide or give reasonable access to copies of all third-party

4

environmental site assessments, property condition reports or assessments and land surveys ordered and obtained by Seller.

4.3     Access to Property. During the Due Diligence Period, Buyer (and its professionals hired to conduct such due diligence) shall have the right upon no less than twenty-four (24) hours advance notice to Seller, to enter onto the Real Property, to make those inspections, investigation and studies of the property identified in **Exhibit A**, as Buyer deems necessary or reasonable. Seller shall cooperate in good faith with Buyer in all reasonable respects in making such inspections.

4.4.    Title; Survey.

(a)     Buyer shall have the right to obtain, at Buyer's sole cost and expense, an owner's title insurance commitment issued by a title insurance company of Buyer's selection, showing the status of title to the Real Property and committing to issue to Buyer at Closing an owner's title policy, with any endorsements required by Buyer. Buyer shall have until August 25, 2017 (the "Title Objection Date") in which to complete its initial examination of the title to the Real Property, to review the survey made available to Buyer (the "Existing Survey") of the Real Property and to examine any matters shown by a title commitment and by the Existing Survey, including any exceptions that affect the Real Property. Should Buyer determine, in Buyer's sole and absolute discretion, that any conditions of title are unacceptable, Buyer shall notify Seller in writing of its objections ("Buyer's Title Objections") on or prior to the Title Objection Date and Seller shall have a period of ten (10) days following the Title Objection Date (said period, the "Seller Title Response Period") within which to use its good faith to cure Buyer's Title Objections to the reasonable satisfaction of Buyer. If Buyer fails to so notify Seller on or prior to the Title Objection Date of Buyer's Title Objections, Buyer shall be deemed to have waived any and all objections or exceptions Buyer may have with regard to the title to the Real Property as existing of record on the Title Objection Date (except for monetary liens secured by the Real Property, and any encumbrances created or placed by, through or under Seller on the Real Property following the Title Objection Date) or which would have been disclosed by an accurate survey of the Real Property on the Title Objection Date and, except for the foregoing, all such matters, encumbrances and exceptions shall be included in the term "Permitted Exceptions" as used herein.

(b)     If Seller fails to cure Buyer's Title Objections within the Seller Title Response Period to the reasonable satisfaction of Buyer after exerting good faith and reasonable efforts, Buyer may terminate this Agreement by written notice to Seller on or before five (5) Business Days following the expiration of the Seller Title Response Period, in which event all Earnest Money shall be returned to Buyer. If Buyer does not timely terminate this Agreement, Buyer is deemed to accept such title as Seller can deliver, and any uncured Buyer's Title Objections and all other matters shown on the Title Commitment shall be included in the term "Permitted Exceptions" as used herein. In the event of termination pursuant to this Section, the parties shall have no further rights or obligations hereunder, except as expressly provided for herein. Notwithstanding anything to the contrary set forth in this Agreement, in no event shall any monetary lien affecting the Real Property, or any Acquired Asset, on the Closing Date including, without limitation, a deed of trust, mortgage, financing statement, or judgment lien be deemed a Permitted Exception, and Buyer shall have no need to provide written notice of objection to any such monetary liens to Seller prior to the Title Objection Date or otherwise.

5

4.5     Environmental Reports; Investigations; Indemnity.

During the Due Diligence Period, Buyer shall review the Phase I environmental site assessment made available for review to Buyer during the Due Diligence Period (the "Existing Environmental Report") and, with Seller's prior written approval, Buyer shall have the right to conduct any reasonable environmental, geological, soils, and other tests, inspections and examinations ("Additional Inspections") so long as the Additional Inspections are completed prior to the end of the Due Diligence Period. Seller's prior approval may require Buyer to prepay the service providers for any Additional Inspections and to obtain releases of Seller by the service providers for any Additional Inspections. Buyer agrees that completion of Additional Inspections includes returning the Property to substantially the same condition that existed prior to Additional Inspections, at Buyer's sole expense, prior to the end of the Due Diligence Period. Failure to comply the terms of this section with respect to completing and paying for Additional Inspections prior to the end of the Due Diligence Period shall be a material breach of this Agreement. Buyer shall indemnify Seller from and against any claims resulting from or related to Buyer's exercise of its right to conduct Additional Inspections, which indemnification shall survive the termination of this Agreement for a period of twelve (12) months.

4.6     Confidentiality. Notwithstanding anything to the contrary herein or in the Confidentiality Agreement, Buyer acknowledges and affirms the continuation, effectiveness and enforceability of the Confidentiality Agreement and the applicability of the Confidentiality Agreement as it pertains to "Confidential Information" (as defined therein) to: (i) this Agreement, (ii) Seller's due diligence information provided to Buyer and (iii) all activities of Seller and its agents, professionals, employees, and contracted parties in connection with this Agreement.

## ARTICLE V
## SELLER RESPONSIBILITIES

Seller warrants that:

5.1     Authorization. Subject to Seller obtaining permission from SFRCC to assign the Ground Lease to Buyer, and the transaction identified herein being confirmed by a Final Sale Order of the Bankruptcy Court as contemplated in **Section 5.3(a)**, (i) Seller has all requisite power and authority to execute and deliver this Agreement and the Transaction Documents to which Seller is a party and to perform its obligations hereunder and thereunder; and (ii) the execution, delivery and performance of this Agreement and the Transaction Documents to which Seller is a party have been duly authorized and approved by all necessary actions on the part of Seller; and (iii) this Agreement and the Transaction Documents to which Seller is a party have been or will have been, as the case may be, duly executed and delivered by Seller, and (assuming that this Agreement and the Transaction Documents to which Buyer is a party have been duly authorized, executed and delivered by Buyer) constitute or will constitute legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their terms.

5.2     No Violations or Conflicts. Neither the execution and delivery of, or performance under, this Agreement or the Transaction Documents by Seller nor the consummation by Seller of the transactions contemplated by this Agreement or the Transaction Documents does or will (i) result in a violation or breach of, or constitute a default or an event of default under, any indenture, mortgage, bond, contract, license, lease, agreement, permit, instrument or other obligation to which

6

it is a party or by which it is bound or to which any of its properties or any of the Acquired Assets is subject, (ii) violate any Law, writ, judgment, injunction or court decree to which it or its properties is subject, or (iii) result in the creation or imposition of any Lien on any Acquired Asset.

5.3    Title to Acquired Assets; Bankruptcy Court Approval.

(a)    The Seller has filed a motion with the Bankruptcy Court (the "Sale Motion"), requesting entry of a court order approving the sale and assignment of the Acquired Assets at an auction to be held on October 3, 2017. The Seller shall use all reasonable efforts to pursue an order from the Bankruptcy Court (the "Sale Order") that, among other things: (i) approves this Agreement and the sale and assignment of the Acquired Assets and authorizes and directs the Seller to proceed with the sale; (ii) includes a specific finding that the Buyer is a good faith buyer of the Acquired Assets under section 363(m) of the Bankruptcy Code and that the provisions of section 363(n) of the Bankruptcy Code have not been violated; and (iii) conveys good and marketable title to the Acquired Assets to the Buyer free and clear of all Liens whatsoever.

(b)    Without limiting the foregoing and notwithstanding any language herein to the contrary, Seller shall convey title to all of the Acquired Assets, free and clear of any Liens at Closing. Upon consummation of the transactions contemplated hereby, Buyer will have acquired title in and to, or, in each of the Acquired Assets, free and clear of all Liens other than the Assumed Liabilities.

5.4    Brokers. Seller is represented by NMREA, Inc. d/b/a Colliers International and Barker Realty, LLC ("Seller's Brokers"), who will receive a Three Percent (3%) commission on the Purchase Price to be shared with any cooperating broker representing Buyer ("Buyer's Broker") pursuant to separate agreement. If there is no Buyer's Broker, Seller's Brokers will receive a Two Percent (2%) commission.

5.5    "As-Is" Sale of Acquired Assets. IT IS UNDERSTOOD AND AGREED THAT EXCEPT AS EXPRESSLY PROVIDED IN THE AGREEMENT OR THE DOCUMENTS TO BE DELIVERED BY SELLER AT CLOSING, AND TO THE EXTENT PERMITTED BY APPLICABLE LAWS, SELLER IS NOT MAKING, AND EXPRESSLY DISCLAIMS, ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE AND ANY IMPLIED WARRANTY OF MERCHANTABILITY WITH RESPECT TO THE ACQUIRED ASSETS. UPON CLOSING, SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE ACQUIRED ASSETS "AS IS, WHERE IS AND WITH ALL FAULTS."

5.6    Further Actions Pre-Closing. During the period from the Agreement Date to the Closing Date, the Seller shall:

(a)    Diligently prosecute approval of the Sale Order and serve notice of the Sale Motion in accordance with the applicable Federal Rules of Bankruptcy Procedure and local court rules on all persons and entities that are parties in interest, creditors of Debtor or hold or assert liens, security interests, claims, licenses, or other interests in the Acquired Assets, or that have expressed an interest in purchasing the Acquired Assets, and any parties who are designated by Buyer;

7

(b)      Not sell or otherwise transfer any of the Acquired Assets to any other person unless directed to so by the Bankruptcy Court;

(c)      Use commercially reasonable efforts to maintain the Acquired Assets and avoid deterioration of the Acquired Assets;

(d)      Cooperate with Buyer's due diligence investigation of the Acquired Assets; and

(e)      Cooperate with Buyer to undertake any such actions or make any public filings as may be required by law; and

(f)      Continue marketing the Acquired Assets in accordance with the Marketing Plan described in the Sale Motion.

## ARTICLE VI
## BUYER RESPONSIBILITIES

Buyer warrants that:

6.1      Organization and Qualification. Buyer is a [entity] duly organized, validly existing and in good standing under the Laws of the State of [State]. Buyer has all requisite power and authority to conduct its business as presently conducted and to own and lease its properties and assets. Buyer is qualified to do business in New Mexico and is in good standing in each jurisdiction in which the ownership or lease of property or the conduct of its business requires such qualification.

6.2      Authorization. Buyer has all requisite power and authority to execute and deliver this Agreement and the Transaction Documents to which Buyer is a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance of this Agreement and the Transaction Documents to which Buyer is a party have been duly authorized and approved by all necessary actions on the part of Buyer. This Agreement and the Transaction Documents to which Buyer is a party have been or will have been, as the case may be, duly executed and delivered by Buyer and (assuming that this Agreement and the Transaction Documents to which Seller is a party have been duly authorized, executed and delivered by Seller) constitute or will constitute, as the case may be, legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their terms.

6.3      Brokers and Finders. [recitation of brokers employed by Buyer, if any]. Any broker fees or commissions owed to Buyer's Broker shall be paid by Seller's Brokers pursuant to separate agreement. In no event shall Seller or any other party within the Bankruptcy Case be responsible for such fees.

## ARTICLE VII
## CONDITIONS PRECEDENT

7.1      Buyer's Conditions. Buyer's obligation to purchase the Acquired Assets is expressly conditioned on the satisfaction or waiver of the following conditions precedent ("Buyer Conditions"):

(a)        Seller securing the Final Sale Order on or before October 20, 2017;

(b)        Buyer accepting any uncured Buyer's Title Objections expressly or by not terminating the Agreement within the time parameters set forth in **Section 4.4(b)**;

(c)        Seller having delivered estoppel certificates executed by Recreational Equipment, Go Wireless, Inc. and Daniela's Closet, Inc. in substantially the form attached hereto as **Exhibit D**; provided, however, the inclusion of changes and comments made by any of the foregoing tenants to an estoppel certificate shall not constitute a failure of this Buyer Condition so long as such changes and comments pertain to facts or matters disclosed in any public record for, or relating to, the Bankruptcy Case or which are otherwise disclosed or known to Buyer prior to the expiration of the Due Diligence Period;

(d)        Seller having executed and delivered all documents required in this Agreement, including but not limited to an assignment of the Ground Lease, assignments of the Commercial Leases, a special warranty deed to the Real Property, and a bill of sale to the Personal Property;

(e)        Seller having timely performed each obligation and covenant of Seller under this Agreement; and

(f)        Seller being able to deliver the Acquired Assets free and clear of all Liens in accordance with the terms of this Agreement.

If any of the Buyer Conditions fails to be satisfied (or waived in writing by Buyer) prior to the Closing Date, to the satisfaction of Buyer, Buyer shall have the right to terminate this Agreement by sending to Seller and Escrow Agent a notice terminating this Agreement whereupon Escrow Agent shall immediately release to Buyer all of the Earnest Money, and neither Buyer nor Seller shall have any further rights or obligations pursuant to this Agreement, except as expressly set forth in this Agreement.

7.2     Seller's Conditions. The obligations of Seller to consummate the transactions contemplated hereby shall be subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived by Seller:

(a)        Buyer providing to Seller evidence satisfactory to Seller, in Seller's sole and absolute discretion, that Buyer has available cash or confirmed funding commitment sufficient to close the purchase contemplated by this Agreement.

(b)        Buyer delivering to Seller, at Closing:

(i)        the balance of the Purchase Price, subject to all credits, prorations and adjustments described herein;

(ii)       all other Transaction Documents to which Buyer is a party; and

(iii)      such other documents or instruments as Seller may reasonably request to carry out the intent and purposes of this Agreement;

9

(c)     Auction Condition. Seller's obligations to Buyer are subject to the Purchase Price being the highest and best price for the Acquired Assets as determined by the Trustee in accordance with the Sale Procedures.

7.3     <u>Conditions to Each Party's Obligations</u>. The respective obligations of each party hereto to consummate the transactions contemplated hereby shall be subject to: (a) Buyer securing the approval of the SFRCC to assume the Ground Lease; (b) Seller obtaining the Final Sale Order permitting Seller to convey to Buyer the Acquired Assets free and clear of all Liens and to assign the Ground Lease and Commercial Leases to Buyer; and (c) no Law having been enacted, entered, promulgated or enforced by any Governmental Entity prior to Closing that prohibits or prevents the consummation of the transactions contemplated hereby.

## ARTICLE VIII
## EXPENSES; PRORATIONS

8.1     <u>Allocation of Taxes</u>.

(a)     All real property Taxes, personal property Taxes and similar ad valorem obligations levied with respect to any Acquired Assets for a taxable period which includes (but does not end on) the Closing Date, whether or not imposed or assessed before or after the Closing Date, shall be apportioned between Seller and Buyer based on the number of days of such taxable period included in the Pre-Closing Tax Period and the number of days of such taxable period after the Closing Date (with respect to any such taxable period, the "<u>Post-Closing Tax Period</u>"). Seller shall be liable for the proportionate amount of such Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period; notwithstanding the foregoing, if Seller is exempt for paying any Taxes attributable to the Pre-Closing Tax Period under federal bankruptcy Law, nothing herein shall be construed to impose any liability or obligation on Buyer for such Taxes attributable to the Pre-Closing Tax Period as it is specifically agreed that all such Taxes shall be an Excluded Liability.

(b)     All sales, use, value added, recording, documentary, conveyancing, franchise, property, transfer, gains and similar Taxes, levies, charges, and fees, if any, (collectively, "<u>Transfer Taxes</u>") incurred in connection with the transactions contemplated by this Agreement shall be paid by Seller. Buyer shall cooperate with Seller, and Seller shall cooperate with Buyer, with respect to the provision of any appropriate resale exemption certifications and other similar documentation. The party that is required by Law to make the filings, reports, or returns with respect to any applicable Transfer Taxes shall do so, and the other party shall cooperate with respect thereto as necessary.

8.2     <u>Rents and Security Deposits.</u> All rents and other similar monies, including but not limited to common area maintenance fees, under the existing Commercial Leases shall be prorated as of the Closing Date. The parties agree to promptly adjust between themselves outside of the escrow any rents received after the Closing Date. All security deposits held by Seller for existing Commercial Leases shall be delivered to Buyer at Closing.

8.3     <u>Fees and Expenses</u>. Except as expressly set forth in this **Article VIII**, all fees, costs and expenses incurred in connection with the preparation, negotiation, execution, delivery or

10

performance of this Agreement, the Transaction Documents and the transactions contemplated hereby or thereby shall be the responsibility of and paid by the party incurring such fees, costs or expenses.

## ARTICLE IX
## TERMINATION

9.1    <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing upon the occurrence of any of the following:

(a)    by mutual written agreement of Seller and Buyer;

(b)    by Buyer in the event of an uncured Buyer's Title Objection pursuant to **Section 4.4(b)**;

(c)    by Buyer if any of the Buyer Conditions expressly set forth herein fails to be satisfied (or waived in writing by Buyer) prior to the Closing Date, to the satisfaction of Buyer;

(d)    by either party if the other party has committed a Material breach of its obligations under this Agreement and such breach remains uncured for a period of ten (10) Business Days after written notice thereof has been given by the non-breaching party (such uncured breach continuing beyond the 10-day cure period, a "<u>Default</u>");

(e)    upon two (2) Business Days' notice by either Seller or Buyer, if there is not a Final Sale Order by October 20, 2017;

(f)    by Buyer upon providing written notice thereof during the Due Diligence Period.

9.2    <u>Effect of Termination</u>. If this Agreement is terminated as provided in this **Article IX**, this Agreement shall forthwith become void and there shall be no liabilities on the part of any party to this Agreement except for those provisions by their nature require performance after termination. The Earnest Money, upon such a termination, shall be disbursed by Escrow Agent in accordance with this Agreement.

9.3    <u>Default by Buyer</u>. Notwithstanding any language herein to the contrary, if Buyer is in Default under this Agreement and Seller tenders performance under this Agreement, Seller's sole and exclusive remedy for such Default is to terminate this Agreement pursuant to **Section 9.1(d)** and receive all of the Earnest Money then being held by Escrow Agent. Buyer and Seller agree that such amount shall be liquidated damages (and not a penalty) for Default by Buyer under this Agreement and is reasonable under the circumstances because of the difficulty, inconvenience and uncertainty of ascertaining damages for such Default. Seller hereby specifically waives any right to pursue any other remedy at law or in equity for such Default by Buyer.

9.4    <u>Default by Seller</u>. If Seller is in Default under this Agreement, Buyer may as its <u>sole and exclusive remedy</u>, terminate this Agreement pursuant to **Section 9.1(d)** and receive a return of all of the Earnest Money.

11

## ARTICLE X
## GENERAL PROVISIONS

10.1    Notices. All notices, requests, demands, consents and other communications hereunder among the parties hereto shall be in writing and shall be deemed given: (i) upon personal delivery; (ii) three (3) days after being mailed by certified or registered mail, postage prepaid, return receipt requested; (iii) the next Business Day after being sent via a nationally recognized overnight courier service; or (iv) upon receipt of electronic or other confirmation of transmission if sent via facsimile or e-mail (if an e-mail address is specified in this section) to the parties hereto, their successors in interest or their assignees at the following addresses and facsimile numbers, or at such other addresses or facsimile numbers as the parties may designate by written notice in accordance with this **Section 10.1**:

(a)    if to Buyer, to:

[Buyer]
[Address]
[email]
Attn: _____

(b)    if to Seller, to:

Railyard Company, LLC
500 Market Street
Santa Fe, NM 87505
Email: craig@craigdill.com
Attn: Craig H. Dill, Chapter 11 Trustee

with a copy (which shall not constitute notice) to:

Walker & Associates, P.C.
500 Marquette N.W., Suite 650
Albuquerque, NM 87102
Email: twalker@walkerlawpc.com
Attn: Thomas D. Walker

10.2    Entire Agreement; No Third-Party Beneficiaries. This Agreement, together with the exhibits to this Agreement, the Transaction Documents, and the Confidentiality Agreement executed by and between Seller and Buyer, constitutes the entire agreement and supersedes all other agreements and understandings, both written and oral, among any of the parties with respect to the subject matter herein. No provisions of this Agreement are intended, nor should they be interpreted, to provide or create any third party beneficiary rights or remedies, or any other rights or remedies, of any kind whatsoever under or by reason of this Agreement in any Person, or the legal representatives of such Person, other than the parties to this Agreement.

10.3    Further Assurances. At the Closing and from time to time thereafter, Seller shall execute, deliver, file, record, or cause to be executed, delivered, filed and recorded, any and all agreements, instruments, certificates or other documents and take such other actions as reasonably

12

requested by Buyer or as may be reasonably necessary or desirable to consummate or implement the transactions contemplated by this Agreement. Without limiting the foregoing, Seller shall promptly perform all actions reasonably requested by Buyer to vest, establish and confirm ownership of the Acquired Assets in Buyer, and enable Buyer to enjoy the benefit of the Acquired Assets.

10.4    Governing Law. This Agreement shall be governed, including as to validity, interpretation and effect, by, and construed in accordance with, the Laws of the State of New Mexico. The Bankruptcy Court shall have exclusive jurisdiction and venue shall lie with the Bankruptcy Court to hear and determine any matter arising in connection with this Agreement. Each party hereto also hereby irrevocably waives any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court and further waives any claim that any such suit, action or proceeding which has been brought in the Bankruptcy Court has been brought in an inconvenient forum. In addition to any other form of service of process authorized by Law, service of process in any suit, action or proceeding hereunder shall be sufficient if mailed to the address specified in **Section 10.1**, and such service shall constitute "personal service" for purposes of such suit or proceeding.

10.5    Assignment. Except as expressly provided herein, neither this Agreement nor any of the rights, interests and obligations under this Agreement may be assigned by Buyer or Seller without the prior written consent of the other party. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

10.6    Waiver; Amendment. No waiver of any term, condition or obligation of this Agreement shall be valid unless in writing and signed by the waiving party. No failure or delay by any party hereto at any time to require the other parties hereto to perform strictly in accordance with the terms hereof shall preclude any party hereto from requiring performance by the other parties hereto at any later time. No waiver of any one or several of the terms, conditions or obligations of this Agreement, and no partial waiver thereof, shall be construed as a waiver of any of the other terms, conditions or obligations of this Agreement. This Agreement may not be amended, changed or modified in any fashion except by written instrument signed by Buyer and Seller.

10.7    Severability. If any provision of this Agreement, or any part thereof, shall be determined by the Bankruptcy Court to be invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected thereby, and each provision hereof shall be enforced to the fullest extent permitted by Law, unless such determination and enforcement (a) would result in a Material adjustment of the Purchase Price, (b) result in a Material change in the Acquired Assets, or (c) would interfere with the intent of the parties hereunder to a Material degree.

10.8    Representation by Counsel. Each party hereto acknowledges that such party has had an opportunity to employ counsel regarding the negotiation, execution and delivery of this Agreement and accordingly agrees that if an ambiguity exists with respect to any provision of this Agreement, such provision shall not be construed against any party because such party or such party's representatives drafted such provision.

10.9    Exclusivity; Solicitation.

(a)    Buyer and Seller acknowledge that under the Bankruptcy Code, the sale of Acquired Assets is subject to the approval of the Bankruptcy Court. Buyer and Seller acknowledge that to obtain such approval, Seller must meet certain requirements, including but not limited to showing that Seller has taken reasonable steps to obtain the highest and best price for the Acquired Assets, including by giving notice of the transactions contemplated by this Agreement to creditors, other interested parties, and the public, providing information about the Acquired Assets to potential bidders, entertaining higher or better offers from qualified bidders and, if necessary, conducting an Auction.

(b)    Seller represents that, other than the transactions contemplated by this Agreement, Seller is not a party to or bound by any agreement with respect to a possible merger, sale, restructuring, refinancing or other disposition of all or any of the Acquired Assets.

10.10    Facsimile Signature; Counterparts. Facsimile or electronic transmission of any signed original document or retransmission of any signed facsimile or electronic transmission will be deemed the same as delivery of an original. This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, but all of which shall constitute but one and the same agreement.

10.11    Capacity of Seller; No Personal Liability. Seller is acting solely and exclusively in his capacity as the duly appointed Chapter 11 Trustee of the Estate. Buyer affirmatively acknowledges, agrees, and understands that (i) Craig H. Dill is not a party to this or any agreement with Buyer in his personal capacity or in any capacity on behalf of any person or entity other than as Chapter 11 Trustee of the Estate, (ii) Craig H. Dill has no personal liability whatsoever for any aspect or part of this Agreement, and (iii) Seller has no knowledge or duty to Buyer to acquire knowledge about Debtor prior to the Petition Date. Notwithstanding the foregoing, nothing herein shall abrogate Seller's duties as Trustee including, without limitation, those duties secured by the Trustee bond filed with the Bankruptcy Court.

**[Signature page follows]**

14

**IN WITNESS WHEREOF**, each party hereto has duly executed this Asset Purchase Agreement on the date set forth next to their signatures below.

**SELLER:**

CRAIG H. DILL, CHAPTER 11 TRUSTEE

Date: _____    By: _____
Name: Craig H. Dill
Title:  Chapter 11 Trustee

**BUYER:**

[BUYER]

Date: _____    By:
_____

Name:
Title:

<u>ACQUIRED ASSETS</u>

The Acquired Assets shall include the following:

     A.    **<u>Real Property</u>**

    1.  <u>Ground Lease</u>

Debtor's interest in the that certain Amended and Restated Ground Lease dated October 1, 2007 between Santa Fe Railyard Community Corporation, a New Mexico non-profit corporation, as ground lessor, and Railyard Company, LLC, as ground lessee, as amended by the First Amendment to Ground Lease effective as of May 18, 2012.

    2.  <u>Condominium Units</u>

Unit 1, Unit 3, and Unit 4 of the Market Station, a Condominium as created by Condominium Declaration for Market Station, a Condominium recorded as Instrument No. 1669764; as shown on plat of survey entitled "Condominium Survey of Market Station for the Railyard Company LLC…" in Plat Book 745, Pages 21-22, as Instrument No. 1669765, records of Santa Fe County, New Mexico.

     B.    **<u>Personal Property</u>**

    1.  <u>Commercial Leases</u>

        a.  Retail Lease between Daniela's Closet, Inc. and Railyard Company, LLC dated May 9, 2008, as amended;

        b.  Retail Lease between Go Wireless, Inc. and Railyard Company, LLC dated September 19, 2008, as amended; and

        c.  Retail Sublease between Recreational Equipment, Inc. and Railyard Company, LLC dated January 12, 2007, as amended.

    2.  <u>Fixtures, Furniture, & Equipment</u>

All fixtures, furniture and equipment owned by the bankruptcy estate of Railyard Company, LLC as of the date of closing. Detailed list to be provided.

# CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Agreement") is entered into as of the __ day of _____ 2017 between _____, on behalf of himself/herself and on behalf of and as agent or representative for any disclosed or undisclosed party or principal (together, "Recipient") and Craig H. Dill ("Trustee"), acting in his capacity as the duly appointed Chapter 11 Trustee in the bankruptcy case captioned *In re Railyard Company, LLC*, No. 15-12386-t11 (the "Bankruptcy Case"), currently pending in the United States Bankruptcy Court for the District of New Mexico (the "Bankruptcy Court"). Recipient and Trustee are sometimes referred to herein individually as "Party" and together as "Parties."

WHEREAS, the Recipient desires to evaluate the purchase from the Trustee (a "Transaction") of the real and personal property located at 500 Market Street, Santa Fe, NM 87505 owned by Railyard Company, LLC ("Debtor"), the chapter 11 debtor in the Bankruptcy Case;

WHEREAS, Recipient wishes to inspect the Property, review and learn information about the Property, and learn about the Debtor and the Debtor's prepetition business activities; and

WHEREAS, Trustee considers such inspections and information to be of a secret and proprietary nature and will disclose such information and permit such inspections only under the terms and conditions provided in this Agreement.

NOW THEREFORE, for good and valuable consideration, including the mutual covenants contained herein, the Parties agree as follows:

1. <u>Confidential Information.</u> "Confidential Information" means any and all information disclosed to the Recipient by Trustee or Trustee's employees, agents, consultants, advisors, attorneys, or other representatives of the Trustee ("Trustee Representatives") in connection with the Property, whether orally, electronically, in writing, observed, obtained or learned by inspection, or otherwise, all of which shall be deemed to be Confidential Information unless the Trustee expressly waives confidentiality in writing.

2. <u>Non-Confidential Information.</u> Notwithstanding the provisions of Paragraph 1, Confidential Information shall not include any information disclosed by the Trustee or Trustee Representatives to the Recipient or Recipient's Representatives to the extent that such information:

    (a)    is in the public domain at the time of disclosure;

    (b)    is known, or becomes known, to the Recipient from a source other than the Trustee or Trustee Representatives, provided that disclosure by such source does not constitute a breach of this Agreement;

    (c)    is independently developed by the Recipient without breaching this Agreement, as evidenced by written records;

Exhibit B
Page **1** of **4**

(d)       prior to the effective date of this Agreement, was already in possession of the Recipient without obligation of confidentiality; or

(e)       is approved in writing for public release by the Trustee.

Confidential Information shall not be deemed to fall within an exception merely because it is included within or is a part of Non-Confidential Information.

3.       <u>Permissible Use of Confidential Information.</u> The Confidential Information shall be used by the Recipient solely for the purpose of evaluating a Transaction and for no other purpose.

4.       <u>Non-Disclosure of Confidential Information</u>. Recipient shall not disclose Confidential Information to any third parties, except that Confidential Information may be disclosed to any of the Recipient's affiliates, directors, officers, employees, attorneys, accountants, consultants, legal and financial advisors and agents ("Recipient's Representatives") who require access to such information in connection with a potential Transaction. Recipient's confidentiality obligations under this Agreement extend to Recipient's Representatives, and Recipient shall be liable for any breach of this Agreement by any of Recipient's Representatives.

5.       <u>Non-Disclosure of Negotiations.</u> Offers, counter-offers, discussions, negotiations, and points and terms of discussions and negotiations, between Recipient or Recipient's Representatives and Trustee or Trustee Representatives are Confidential Information.

6.       <u>Disclosure Required by Law.</u> Notwithstanding any provisions to the contrary, the Recipient may disclose the Confidential Information without the Trustee's prior written consent to the extent such Confidential Information is legally required to be disclosed by judicial or other governmental action including without limitation, by discovery, subpoena or other legal or administrative process; provided, however, that the Recipient shall give prompt written notice of such judicial or other governmental action to the Trustee and the Trustee shall be afforded the opportunity to exhaust reasonable legal remedies to prevent or limit the scope of any disclosure of the Confidential Information. The Recipient shall not oppose any such action by the Trustee.

7.       <u>No Waiver by Trustee.</u> The disclosure of any Confidential Information shall not constitute a waiver by Trustee of any of its rights under this Agreement. No failure or delay by the Trustee in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any right, power or privilege hereunder

8.       <u>No License or Conveyance.</u> This Agreement does not constitute any license or conveyance to the Recipient of any rights relating to the Confidential Information. Confidential Information furnished in tangible form shall not be duplicated by Recipient except for the uses authorized in this Agreement.

Case 15-12386-t11     Doc 644     Filed 06/27/17     Entered 06/27/17 17:49:48 Page 33 of 39

9.     Duties After Termination. The termination of this Agreement shall not limit any cause of action or claim arising from Recipient's breach of or failure to perform any duty or obligation under this Agreement.

10.     No Duty to Disclose. This Agreement shall not obligate the Trustee to disclose any Confidential Information to the Recipient and any disclosure of Confidential Information shall be at the Trustee's sole discretion.

11.     No Warranty; Recipient's Waiver of Claims. The Trustee makes no representation or warranty as to the accuracy or completeness of any Confidential Information. For good and valuable consideration, including this Agreement and the disclosure of Confidential Information, Recipient waives any and all claims against the Bankruptcy Estate, Trustee and Trustee Representatives relating to the accuracy or completeness of any Confidential Information.

12.     Return of Confidential Information. Upon the Trustee's written request, the Recipient shall return as promptly as practicable, but in any event within thirty (30) days, all Confidential Information received from the Trustee or Trustee Representatives, including but not limited to all documents, notes, photographs, images, files, digital files, or other information or materials, in any form, with respect to, including or reflecting Confidential Information, along with all copies of such Confidential Information, and all materials derived from such Confidential Information. Alternatively, the Recipient may elect to destroy the Confidential Information within the thirty (30) day time period; provided that the Recipient shall give the Trustee a certificate confirming its action promptly after the destruction is completed.

13.     Entire Agreement. This Agreement embodies all of the understandings between and among the Parties hereto concerning the subject matter hereof, and merges all prior discussions and writings between and among them.

14.     No Assignment by Recipient; Authority; Trustee's Successor is Beneficiary. Recipient may not assign this Agreement without the prior written consent of the Trustee. Recipient warrants and represents that Recipient has actual authority to execute this Agreement on his own behalf and on behalf of and as agent or representative for any disclosed or undisclosed party or principal. This Agreement inures to the benefit of any authorized successor to the Trustee.

15.     Remedies. The Parties acknowledge that any disclosure of the Confidential Information will cause irreparable harm to the Bankruptcy Estate and the Trustee. Therefore, the Parties agree that if the Recipient fails to abide by the terms of this Agreement, Trustee will be entitled to specific performance, including immediate issuance of a temporary restraining order or preliminary injunction enforcing this Agreement, and to judgment for damages caused by such breach, and to any other remedies provided by applicable law.

16.     Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New Mexico. The Bankruptcy Court shall have exclusive jurisdiction to hear and determine any matter arising from or under this Agreement.

Exhibit B
Page **3** of **4**

17.     <u>Counterparts; Facsimile Signatures.</u> This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same document. This Agreement shall not become effective until it has been fully executed by all Parties. Copies and electronic transmissions (including faxes and documents sent via email) of signed copies of this Agreement shall have the same force and effect as a signed original contract.

18.     <u>Severability.</u> The provisions of this Agreement are severable, and if any one or more of such provisions is determined to be judicially unenforceable, the remaining provisions shall nevertheless be binding and enforceable.

19.     <u>Amendment.</u> This Agreement may be modified or waived only in writing signed by the Trustee and the Recipient expressly modifying or waiving such agreement.

This Agreement has been executed on the dates set forth below to be effective as of the date first set forth above.

Craig H. Dill, Chapter 11 Trustee

 

_____
Recipient

By: _____     By: _____
Name: _____     Name: _____
Title: _____     Title: _____
Date: _____     Date: _____

## SELLER INFORMATION

Seller will provide the following documents and information to Buyer:

1. Copies of all Commercial Leases and amendments thereto;

2. Copies of the Ground Lease;

3. Copy of the Condominium Declaration for Market Station, a Condominium recorded in the Office of the Santa Fe County Clerk on May 18, 2012 as Doc. No. 1669764;

4. Copies of title information, including but not limited to title insurance policies, title opinions, surveys, and copies of title exceptions;

5. Copies of all inspections and reports concerning environmental matters affecting the Acquired Assets; and

6. Copies of certificates of occupancy, permits, approvals and licenses concerning the Acquired Assets.

Exhibit C

# TENANT ESTOPPEL CERTIFICATE

To:     Any person or entity that is approved by the United States Bankruptcy Court for the District of New Mexico to acquire Condominium Units 1, 3 and 4 located at 500 Market Street, Santa Fe, New Mexico (the "**Buyer**") and any lender to Buyer ("**Buyer's Lender**", and together with Buyer, the "**Buyer Parties**")

Re:     Name of Tenant's Business:  _____
        Lease between Craig H. Dill, Chapter 11 Trustee of the Bankruptcy Estate of Railyard Company LLC, a New Mexico limited liability company, Debtor in Chapter 11 Bankruptcy Case Number 15-12386-t11 pending in the United States Bankruptcy Court for the District of New Mexico, as landlord ("**Landlord**"), and _____, a _____, as Tenant ("**Tenant**"), dated _____, 20___ for approximately ____ square feet of space (the "**Premises**") in the Property.

Tenant understands that Buyer Parties are relying on this certificate in connection with the acquisition and/or financing of Buyer's acquisition of the Property. Tenant, as the tenant under the above-referenced lease (as amended by the amendments, if any, listed below, the "**Lease**") hereby certifies as follows:

1.      The Lease is in full force and effect and has not been modified, supplemented, or amended, except: _____ [*if space is left blank, the word "none" is deemed to have been inserted*]. The Lease represents the entire agreement between Landlord and Tenant as to the Property.

2.      The Lease has been duly executed and delivered by, and is a binding obligation of, Tenant

3.      Tenant has paid rent for the Premises up to and including _____, 20___. The current amount of base monthly rent is $_____.       The current monthly common area charges paid by Tenant are $_____, and the current real property tax charges paid by Tenant are $_____.

4.      Tenant has paid a security deposit of $_____.

5.      The commencement date of the Lease was _____, _____. The current expiration date for the Lease is _____, 20___.   Tenant has no option(s) to renew or extend the Lease, except: _____ [*if space is left blank, the word "none" is deemed to have been inserted*].

6.      Tenant is in physical occupancy of the Premises and is operating its business in the Premises.

7.      As of the date hereof, to the current actual knowledge of Tenant, (i) there exists no breach or default by Tenant or Landlord under the Lease except: _____ [*if space is left blank, the word "none" is deemed to have been inserted*]; and (ii) Tenant has no existing claims, defenses or offsets against rental due or to become due under the Lease.

8.      Tenant has not assigned any of its rights under the Lease or sublet all or any portion of the Premises, except as follows: _____ [*if space is left blank, the word "none" is deemed to have been inserted*].

9.      Tenant has no right or option to purchase all or any part of the Premises or the building of which the Premises is a part.

Exhibit D
Page **1** of **3**

The person executing this certificate on behalf of Tenant is duly authorized to execute this certificate.

Exhibit D
Page **2** of **3**

Executed by Tenant on _____, 20__.

| | **TENANT:** |
| | |
| | _____ |
| | a _____ |
| | |
| | By: _____ |
| | Name: _____ |
| | Title: _____ |