UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

RAILYARD COMPANY, LLC,  Case No. 15-12386 t11

Debtor.

## OPINION

Before the Court is William F. Davis & Assoc., P.C.'s application for compensation for work done as counsel for the debtor in possession. Two members of the Debtor, Messrs. Steve Duran and Rick Jaramillo (together, the "Members") objected. After considering all evidence and arguments presented at trial, the Court will overrule the objections in large part and grant the application to the extent set forth below.

I.  FACTS[1]

The Members formed the Debtor to construct and operate a large, multi-unit building (the "Market Station") at a rail station near downtown Santa Fe, New Mexico. Historically, Mr. Jaramillo oversaw business operations while Steve Duran provided funding and performed construction work with the help of his brother, David Duran.

The Market Station was built on property subject to a long-term ground lease between the Debtor as lessee and the Santa Fe Railyard Community Corporation ("SFRCC") as lessor. To refinance existing debt encumbering the Market Station, in December 2014 Debtor obtained a $9,670,000 bridge loan from Thorofare Asset Based Lending Fund, III ("Thorofare"). Steve Duran

---

[1] In makings its findings, the Court took judicial notice of the docket. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (court may *sua sponte* take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) ("[t]he bankruptcy court appropriately took judicial notice of its own docket").

made a $545,000 capital contribution to the Debtor to facilitate the Thorofare loan closing. The loan agreement states that $520,000 would be set aside to fund tenant improvements, $300,000 of which could be used for a bar/restaurant the Members wished to open.

Shortly after the loan closing, Flying Star (a significant tenant) filed a chapter 11 bankruptcy case and moved out of the Market Station. This was a major blow to the Debtor's cash flow and refinancing plans.

In June 2015, Thorofare declared a default and refused to release any further funds for tenant improvements. Thorofare filed a state court action on July 16, 2015, seeking to foreclose its first mortgage on the Market Station. At the time, the Debtor was also involved in significant disputes with REI, SFRCC, and the City of Santa Fe (the "City"). REI alleged the Debtor had overcharged for common area maintenance ("CAM") and property taxes. REI started paying all CAM charges and taxes into its attorneys' trust account in 2013, after Debtor failed to provide records for the amounts previously billed. The acrimony with SFRCC was caused by SFRCC's refusal to approve various national retailers as Market Station tenants. Debtor's disputes with the City related to a condominium the City purchased in the Market Station. Debtor also alleged the City was to blame for Market Station's structural problems, and caused Debtor to breach its lease with REI.

Debtor filed this chapter 11 case on September 4, 2015. Mr. Jaramillo was designated as the responsible party. Bill Davis of William F. Davis & Assoc., P.C. ("Counsel") filed an application pursuant to 11 U.S.C. § 327[2] for the firm to be employed as attorneys for the debtor in possession. Counsel explained to Mr. Jaramillo that he represented the Debtor, had duties to the estate, and could not represent any Member individually.

---

[2] Unless otherwise noted, all statutory reference are to 11 U.S.C.

Within a month of the petition date, Thorofare filed a motion to appoint a chapter 11 trustee or require Debtor to employ a property manager. REI joined in the motion. The parties cited Mr. Jaramillo's alleged mismanagement, volatility, and refusal to maintain records. A trial was set for February 2016. Discovery was voluminous and contentious. REI repeatedly sought records supporting the CAM charges and taxes from 2008 forward. The Court (Hon. Robert Jacobvitz) encouraged Debtor to produce such records, and telegraphed that the asserted overcharges could be a focus at trial. At various hearings, Mr. Jaramillo asserted the records were on a damaged computer, and later that they had been stolen.

During the pre-trial period, tension arose between the Members and Counsel. The Members viewed the chapter 11 case as another avenue to litigate against their various adversaries. Notwithstanding Counsel's admonishment that he represented only the Debtor, Mr. Jaramillo directed Counsel to sue Thorofare, REI, the City, and other parties, and to get involved in the Members' ongoing state court litigation. For the most part Counsel refused, both because he did not represent the Members individually, and because he questioned the merit of the claims. Counsel focused instead on resisting the appointment of a trustee, responding to REI's and Thorofare's various motions, and negotiating the use of cash collateral. Counsel explained that if the Debtor had any meritorious claims, they could be asserted after the trustee trial.

The Members also were unhappy that Counsel went to Singapore for about a month in late 2015/early 2016. As discussed below, the trip did not affect the outcome of the case because Counsel worked remotely and assigned tasks to his associates.

The Court tried the trustee motion on February 17-19, 2016. REI and Thorofare presented evidence regarding Debtor's failure to keep records supporting CAM and property tax charges. They also gave various examples of disputes and other unprofessional interactions between Mr.

Jaramillo and Debtor's lender and tenants. Counsel responded with testimony by Mr. Jaramillo and other evidence that REI, Thorofare, and the City were to blame for the acrimony and financial problems. For example, Counsel presented evidence that REI breached the lease through non-payment of rent and CAM charges and by retaining an unlicensed contractor to perform tenant improvements; argued that Debtor did not default under the Thorofare loan documents, and that Thorofare wrongfully withheld funds that were critical to the Market Station's success; and presented evidence that SFRCC caused the project to fail by wrongfully refusing to approve tenants.

By a written opinion entered March 30, 2016 (the "Trustee Ruling"), the Court rejected Debtor's theories and granted the motion to appoint a trustee. The Court concluded that the Debtor, acting through Mr. Jaramillo, grossly mismanaged the Market Station. The decision was based on:

- The failure to provide an accounting to tenants or maintain business records, particularly those relating to CAM and taxes;
- Mr. Jaramillo's decision to overbill REI for CAM and taxes by about 240% for three years;
- The failure to make any payments to Thorofare;[3] and
- Mr. Jaramillo's unprofessional, aggressive interactions with Debtor's lender and tenants, which included threatening e-mails and phone calls characterizing REI as a "corporate monster;" accusing Thorofare of stealing Debtor's property and acting in bad faith; interacting with Flying Star in a way that was "conflictive" "contentious," and "exhausting;" and maintaining significant feuds with all but one tenant.

The Members were furious with Counsel after the Trustee Ruling was issued. Counsel filed a motion to withdraw on April 4, 2016. However, the Court deferred ruling on the motion until after a trustee was selected. Counsel continued working on the case, and filed an appeal of

---

[3] Thorofare received the first five monthly loan payments from an interest reserve holdback. Once the holdback was exhausted, the Debtor was required to start making monthly payments. It never did.

-4-

the Trustee Ruling. Counsel also succeeded, following several days of trial, in demonstrating that the United States Trustee's ("UST's") first chapter 11 trustee candidate had a conflict of interest.

The Members' second "conflict of interest" objection was not as successful. On July 13, 2016 the Court approved the appointment of the UST's second candidate, Craig Dill, as chapter 11 trustee. The Court entered an order allowing Counsel to withdraw on July 18, 2016. Several days later, the case was transferred to the Hon. David Thuma.

After Counsel withdrew, the Members continued to pursue their disputes and participate in the case. They sued the first chapter 11 trustee candidate, Chris Pierce, and Thorofare's attorney, Benjamin Thomas, in federal district court. They also sought to disqualify the trustee's counsel and the Court based on an alleged conflict of interest. The Members obtained counsel for a brief period, but he appears to have withdrawn.

Davis filed his application for attorney fees on August 11, 2016, seeking $186,295.58. Of that amount, $120,245.71 remains unpaid. The Members objected, asserting that Counsel did not provide zealous or effective legal representation. They argue that, but for Counsel's mishandling of the trustee trial, they would still be in control of Debtor, with better prospects for reorganization.

II. DISCUSSION

A. Section 330(a).

Attorney compensation in Chapter 11 cases is governed by 11 U.S.C. § 330(a). To be compensable, the fees must be for services that were "actual" and "necessary." § 330(a)(1)(A). If the applicant clears these hurdles, then the fees must be "reasonable." *Id. See also In re Lederman Enterprises, Inc.*, 997 F.2d 1321, 1323 (10th Cir. 1993); *In re Commercial Financial Services, Inc.*, 427 F.3d 804, 811 (10th Cir. 2005).

B. Whether the Services Were Necessary.

Whether services were necessary means "whether they were necessary to the administration of, or beneficial toward the completion of, a case under [title 11]." *In re Schupback Investments, LLC,* 2014 WL 6680122, at *8 (10th Cir. BAP 2014). *See also Lederman*, 997 F.2d at 1323 (necessary services are those that benefitted the estate). The potential benefit must be measured when the services are provided, not when the fee application is heard. *Schupback Investments,* 2014 WL 6680122, at *8; *In re Kitts Development*, 474 B.R. 712, 720 (Bankr. D.N.M. 2012); *In re Macco Properties, Inc.,* 540 B.R. 793, 868 (Bankr. W.D. Okla. 2015). Thus, work that had a reasonable chance of succeeding when it was performed can be necessary and beneficial even if it was not ultimately successful. *Schupback Investments*, 2014 WL 6680122, at *8; *Kitts Development*, 474 B.R. at 721.

The Court may also consider the effectiveness and zealousness of the representation in evaluating the benefit to the estate. *See, e.g., In re Collida,* 270 B.R. 209, 214 (Bankr. S.D. Tex. 2001) (considering the attorney's effectiveness under § 330(a), and noting: "[t]he highest level of effective, efficient, and professional representation is exemplified by counsel who have a proactive strategy … to satisfy the requirements of the Code, Rules, and orders…"). However, the attorney must balance his obligation to represent the client zealously with the obligation to provide reasonable services for the sole benefit of the estate. *See In re Keene Corp.,* 205 B.R. 690, 698 n.7 (S.D.N.Y. 1997) ("services must benefit the estate"; "it is not enough for an attorney to work ethically and zealously for a client whose interests may be antithetical to the estate's").

The Members argue that Counsel's representation fell short in a number of areas, requiring a reduction in or denial of compensation. The Court evaluates each alleged failures as follows:

| Alleged mistake or failure | Discussion |
|---|---|
|  |  |

| | |
|---|---|
| Counsel went to Singapore when he should have been in Albuquerque working on the case. | The Members argue the Singapore trip resulted in a lapse in cash collateral authority in January 2016. The Court disagrees. Counsel credibly testified that he assigned the cash collateral issues to his associate, and that Mr. Jaramillo failed to timely submit documents to the associate, which resulted in the lapse.<br>    The Members also argue that Counsel's travel impeded his ability to prepare for the trustee trial. There is no evidence to support the assertion. Counsel was available by telephone and e-mail while he was away. The record indicates that Counsel was well prepared for the trustee hearing, and did an effective job representing the Debtor. |
| Counsel's refusal to sue or object to the claims of SFRCC, Thorofare, REI, and/or the City before the trustee trial. | Counsel's decision not to proceed as requested was reasonable. The acrimony with tenants, neighbors, etc. was a focus of the trustee trial. Further, Counsel testified that many of the claims might have violated Rule 11. For example, Debtor's contract with SFRCC allows SFRCC discretion to reject any proposed tenant. The Court finds Counsel's testimony on this point credible; the Members have since filed or alleged many questionable objections and claims. |
| Counsel's failure to litigate on behalf of the Members and propound discovery in the ongoing state court litigation. | Counsel was justified. Counsel represented the Debtor, not the members. His duty was to the estate. He could not represent the Members individually. |
| Counsel's failure to focus on REI's wrongdoing during the trustee hearing, including: the fact that REI used an unlicensed contractor; refused to pay rent/CAM charges; and allegedly failed to continue settlement discussions after a Ms. McKenzie left its employ. | The record reflects Counsel argued the relevant points relating to REI at trial. The Court specifically acknowledged the unlicensed contractor issue in its ruling. *See* Trustee Ruling, p. 8 ("Debtor declared REI in default under the Sublease for delivering a fraudulent lien waiver and retaining an unlicensed contractor to perform tenant improvements…"). Further, the alleged incident occurred in 2008, and has no bearing on whether to appoint a trustee under § 1104. The behavior of a tenant seven years pre-petition is not relevant.<br>    As discussed above, REI's decision to sequester rent and CAM charges was at the heart of the trial, and the Court determined that Debtor was to blame.<br>    Finally, the fact that an REI employee was willing to discuss a resolution that ultimately fell through after she left the company has no bearing under § 1104. |
| Counsel's failure to focus on Thorofare's wrongdoing, specifically Thorofare's bad faith and violation of a pre-loan term sheet. | The Court finds no wrongdoing. The pre-loan term sheet is a "no-shop" agreement, preventing Debtor from using the proposed loan terms for 45 days to try to get a better deal. Further, the record reflects that Counsel argued, based on the binding loan documents, that Thorofare caused the project to fail by wrongfully withholding disbursements meant for tenant improvements. The Court rejected this argument and held that |

| | |
|---|---|
| | Thorofare was not required to release the funds because "Debtor defaulted on the Loan Documents in several respects." *See* Trustee Ruling, p. 15. In any event, as discussed above, Thorofare's conduct was not the focus under § 1104. |
| Counsel's failure to focus on the City's wrongdoing, specifically the fact that the City did not provide infrastructure and caused Debtor to breach the lease with REI. | Most the evidence about the acrimony with the City focused on record keeping issues and Mr. Jaramillo's failure to pay fees. The record reflects Counsel argued that the City failed to address infrastructure problems such as faulty fire alarms. As with the other actors, however, the City was not on trial. The focus of § 1104, and therefore the trial, was Debtor's inappropriate responses when disputes did arise. |
| Counsel's failure to focus on the things Mr. Jaramillo achieved, such as getting a five year lease renewal with REI; obtaining about $6.3 million in loan forgiveness from Debtor's initial lender; and obtaining a favorable settlement with the City through the sale of a condominium unit to the City. | There is no evidence that REI wished to leave the location, so obtaining a lease renewal should not have been difficult. *See* Trustee Ruling, p. 23. The Members gave up about 19% of the membership interests in Debtor in exchange for the loan forgiveness from the initial lender. Finally, it is not clear that the City's waiver of about $188,000 in impact fees or rent reduction benefitted the Debtor, based on issues relating to collectability.<br>In any event, testimony about Mr. Jaramillo's accomplishments would not have changed the outcome of the trustee trial. Nothing in § 1104 or the case law suggests that dishonesty and gross mismanagement can be offset by claimed accomplishments. |
| Counsel's failure to elicit testimony from Steve Duran and REI's former employee, Ms. McKenzie. | For the reasons above, Ms. McKenzie's testimony would not have changed the result. Nor would Mr. Duran's testimony, as record reflects Mr. Duran agreed with most of Mr. Jaramillo's actions. Mr. Duran is a co-plaintiff in all of the Members' questionable lawsuits. The fact that Mr. Duran might testify that he felt misused and discriminated against by the tenants and lender would not have changed the Court finding of Debtor's mismanagement. |

Based on the foregoing, the Court concludes Counsel's services rendered to Debtor were actual, zealous, effective, necessary, and beneficial to the estate.

C. <u>Whether the Fees Are Reasonable</u>.

In evaluating the reasonableness of a proposed fee, "the adjusted lodestar approach is used, taking into account each of the factors specifically mentioned in § 330(a)(3) plus additional … factors" articulated in *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714 (5th Cir. 1974). *In re Market Center East Retail Property, Inc.,* 730 F.3d 1239, 1249 (10th Cir. 2013).

-8-

Section 330(a)(3) requires courts to consider the nature, extent, and value of the services, taking into account all relevant factors, including:

> (A) the time spent on such services;
> (B) the rates charged for such services;
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3). The *Johnson* factors, which are somewhat duplicative of § 330(a)(3), require the Court to consider:

> (1) The time and labor required;
> (2) The novelty and difficulty of the questions;
> (3) The skill requisite to perform the legal service properly;
> (4) The preclusion of other employment by the attorney due to acceptance of the case;
> (5) The customary fee;
> (6) Whether the fee is fixed or contingent;
> (7) Time limitations imposed by the client or the circumstances;
> (8) The amount involved and the results obtained;
> (9) The experience, reputation, and ability of the attorneys;
> (10) The "undesirability" of the case;
> (11) The nature and length of the professional relationship with the client; and
> (12) Awards in similar cases.

*Market Center East,* 730 F.3d at 1247 (citing *Johnson*, 488 F.2d at 717-719). The Court weighs each *Johnson*/§ 330(a)(3) factor as follows:

| § 330(a)(3) Factor | Discussion |
| --- | --- |
|  |  |
| (a)(3)(A) Time spent | Counsel and his firm spent 679.66 hours on the necessary services. This amount of time seems a bit high, although the case was very contentious. |

| | |
|---|---|
| (a)(3)(B) Rates charged | The rates charged - $325 for Counsel and $225 for his associates – are reasonable and customary for attorneys in New Mexico with their level of experience. |
| (a)(3)(C) Necessary/beneficial | As discussed in detail above, the services were beneficial at the time they were rendered. |
| (a)(3)(D) Timeliness | The record indicates that the services were performed timely. |
| (a)(3)(E) Skill/experience | Counsel is a New Mexico certified bankruptcy specialist. His firm is well known in the field. Counsel is very skilled and experienced in representing debtors in possession. |
| (a)(3)(F) Customary compensation in non-bankruptcy cases | Based on the Court's experience, the fees are consistent with the customary compensation charged by practitioners in non-bankruptcy cases. |
| *Johnson* Factors | Discussion |
| | |
| Time and labor required? | This factor is more applicable to contingent fee cases. The time spent was fairly reasonable, although the Court will make a slight adjustment. |
| Novelty and difficulty of the questions? | The case did not present novel or difficult legal questions. The difficultly was in trying to fight a war on all fronts, defending against motions by various tenants, lenders, etc. |
| Skill requisite to perform the legal service properly? | The case required an attorney skilled in Chapter 11 cases, and with extensive trial experience. Counsel has those skills. |
| Preclusion of other employment due to acceptance of the case? | This case likely precluded other employment to some extent, since it was so hotly contested. Since Counsel was billing hourly, this factor is not particularly applicable. |
| Customary fee? | The total fee is slightly high for a case of this size and complexity. |
| Whether the fee is fixed or contingent? | The hourly rates charged by Counsel and his associates were fixed. |
| Time limitations imposed by the client or circumstances? | The case required Counsel to address things on an emergency basis and to comply with various court-imposed deadlines. Counsel provided services in a timely fashion. |
| Amount involved and results obtained? | The case involved a multi-million dollar development project. The results were as good as can be expected, and the Court is convinced Debtor would not have achieved a better result with a different attorney. The Trustee Ruling is carefully reasoned and drafted, and outlines in detail the Debtor's dishonesty and gross mismanagement. |
| Experience, reputation, and ability of the attorneys? | Counsel and his associates are experienced and have good reputations as debtor in possession counsel. |
| Undesirability of the case? | This factor is more applicable to contingent fee cases. But, the case was challenging. There was substantial animosity between the Members and their adversaries. |

| Nature and length of professional relationship with the client? | Not applicable. |
|---|---|
| Awards in similar cases? | A fee award of $186,295.58 is a little high considering similar cases, although this case presented some unique challenges. |

As the factors suggest, this was a difficult case, made more difficult by the personalities involved. However, the total fee is slightly high, even after considering the particular circumstances. In light of the § 330(a)(3)/*Johnson* factors, the Court concludes it should reduce the requested fee amount by 5%, or $9,314.78. Of the $186,295.58 requested, Counsel therefore will be awarded $176,980.80.

### III. CONCLUSION

The evidence shows that Counsel effectively represented the Debtor. Given the circumstances, it is unlikely Counsel (or anyone else) could have prevented the appointment of a trustee. Counsel's services were actual, beneficial and necessary, and an award of $176,980.80 is reasonable. The Court will award that amount to Counsel in a separate order.

_____
David T. Thuma
United States Bankruptcy Judge

Entered: July 14, 2017

Copies to:

William F. Davis
6709 Academy NE, Suite A
Albuquerque, NM 87109

Eric Nicholas Ortiz
510 Slate Ave. NW
Albuquerque, NM 87102

Rick Jaramillo
215 Calle Roble
Santa Fe, NM 87501

Steve Duran
21 Entrada De Duran
Santa Fe, NM 87506